Scott D. CLABOURNE, Petitioner–Appellant,

v.

Samuel A. LEWIS; Grant Wood, Respondents–Appellees.

Scott D. CLABOURNE, Petitioner–Cross–Appellee,

v.

Samuel A. LEWIS; Grant Wood, Respondents–Cross–Appellants.

Nos. 94–15587, 94–15699.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 28, 1995.

Decided Sept. 8, 1995.

1374

Carla G. Ryan and Michael J. Bloom, Tucson, AZ, for petitioner-appellant-cross-appellee.

Joseph T. Maziarz, Assistant Attorney General, Phoenix, AZ, for respondents-appellees-cross-appellants.

Before: REINHARDT, KOZINSKI and RYMER, Circuit Judges.

KOZINSKI, Circuit Judge.

**I**

On the evening of September 18, 1980, Laura Webster left work with some friends and went to the Green Dolphin, a Tucson bar frequented by students from the University of Arizona. Sometime around midnight, she left the bar with three strange men. The next morning, Webster's naked body was found lying in the dry bed of the Santa Cruz River. Wrapped in a bloody sheet, Webster had been strangled with a blue and white bandana, then stabbed to death. She had also been severely beaten, and traces of semen were found in her mouth, rectum and vagina.

The Tucson police got their first break in the case almost a year later when a woman named Shirley Martin reported that her former boyfriend, Scott Clabourne, had made several statements inculpating himself in a homicide. Clabourne was in custody on an unrelated burglary charge at the Pima County Jail, where he was interviewed by Detectives Bustamante and Reuter of the Tucson Police Department.

Clabourne gave a detailed, taped confession to the rape and murder of Laura Webster. According to Clabourne, he and two other men, Larry Langston and a man Clabourne called "Bob" (later identified as Edward Carrico), went to the Green Dolphin to "get some women." Langston convinced Webster to leave the bar with them by promising to take her to a cocaine party Clabourne was purportedly hosting; instead the

three men took Webster to a house Langston had been taking care of for a friend. The three men forced Webster to remove all her clothes and to serve them drinks. They then raped her repeatedly over the course of several hours. Though a much larger man than Langston, Clabourne claims to have been afraid of Langston; he also claims to have been intoxicated. Langston was the instigator, and he "made" the others take part. At the end of the night, Langston instructed Clabourne to kill Webster, and Clabourne obeyed: He strangled Webster with a bandana he carried, and then stabbed her with a knife.

Three days after Detectives Bustamante and Reuter interviewed Clabourne, a criminal information was filed charging Clabourne with first-degree murder, kidnapping and sexual assault. Lamar Couser was appointed as Clabourne's counsel. Couser brought a pretrial motion to suppress the confession, which was denied. He also moved for a hearing to determine Clabourne's competency to stand trial, but the state called two psychiatrists to testify that Clabourne was not so mentally impaired that he would be unable to assist in his own defense. The court found Clabourne competent.

Clabourne was tried alone.[1] The prosecution relied primarily on Clabourne's taped confession, but also introduced evidence of other incriminating statements Clabourne made after the murder. Shirley Martin testified that Clabourne had admitted committing the crime on several occasions (although his accounts were not consistent). Barbara Bailon, who worked at the Salvation Army halfway house, testified that Clabourne had confessed to killing a girl. Scott Simmons, a Pima County Jail Corrections officer, testified that Clabourne had told him about the

crime before giving his taped confession. And a second corrections officer, Dale Stevenson, testified that he overheard Clabourne tell another inmate, "Yeah, I raped her. She didn't want it but I know she liked it."

The state also introduced testimony to corroborate Clabourne's confession. Shirley Martin testified that the blue and white bandana found tied around Webster's neck was similar to one that belonged to Clabourne. The owner of the house where the rape and murder occurred identified the sheet in which Laura Webster's body had been found and testified that the mattress on one of her beds had been turned over to conceal large stains. And Webster's friend Rick Diaz identified Clabourne as one of the men who had left the Green Dolphin with Webster.

Couser raised an insanity defense. However, he called only one witness: Dr. Sanford Berlin, a psychiatrist who had treated Clabourne several years previously at the University of Arizona Medical Center.[2] Couser did not contact Dr. Berlin until the week of trial. Perhaps for that reason, Dr. Berlin was not prepared to testify as to Clabourne's mental state at the time of the murder; he could only surmise that Clabourne might be suffering from a mild form of schizophrenia. The state put two psychiatrists on the stand to testify that Clabourne understood the nature of his actions and the difference between right and wrong, and that he was legally sane at the time of the murders. Couser cross-examined the state's experts, but put on no other witnesses.

Clabourne was convicted on all counts,[3] and a sentencing hearing was held before Judge Richard N. Roylston, who had also presided at trial. Judge Roylston found that the offense was committed in an especially

---

1. Langston and Carrico both negotiated plea agreements with the state. Langston was sentenced to life in prison; Carrico got probation!

2. Clabourne was treated because he was experiencing psychotic episodes. Dr. Berlin was only a resident during that period. Clabourne's psychiatrist at the time, Dr. Killingsworth, died before the trial.

3. The jury in this case was instructed to convict Clabourne of first-degree murder if they deter-

mined that he killed Laura Webster either with premeditation or in furtherance of the felony of kidnapping or sexual assault. *See* Ariz.Rev.Stat. Ann. § 13–1105. The jury had to be unanimous in determining that Clabourne committed first-degree murder, but each member of the jury did not have to rely on the same theory. Under Arizona law, "felony murder is subsumed into first degree murder." *Carriger v. Lewis*, 971 F.2d 329, 336 (9th Cir.1992) (en banc).

heinous, cruel or depraved manner, an aggravating circumstance under Ariz.Rev.Stat. Ann. § 13–703(F)(6).[4] Couser argued that Clabourne should not be sentenced to death because he was mentally impaired at the time of the offense, but he put on no evidence at the sentencing hearing, relying on the evidence presented at the guilt phase of the trial. Judge Roylston concluded that Clabourne's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired but was not significantly impaired." Judge Roylston did not consider this evidence sufficiently compelling to be a mitigating circumstance under Ariz.Rev.Stat.Ann. § 13–703(G)(1),[5] and in any event found that whatever mitigating effect Clabourne's impairment might have had was outweighed by the cruel and depraved manner in which he had committed the offense.[6] Judge Roylston sentenced Clabourne to death.

After duly exhausting his state court remedies, Clabourne filed this petition for a writ of habeas corpus raising 104 distinct challenges to his conviction and sentence. The district court catalogued Clabourne's claims to determine which ones had been properly preserved for review,[7] and held an evidentiary hearing on Clabourne's ineffective assistance of counsel claim. The district court concluded that Couser's performance had been deficient in several respects: Among other things, Couser failed to interview key witnesses before trial (including his own expert), neglected to supply the state psychiatrists with background material on Clabourne's history of mental illness, and failed to put on any evidence in mitigation at the sentencing hearing. Largely because these

errors did not affect the admissibility of Clabourne's confession, the district court held that Couser's deficient performance did not prejudice Clabourne at trial and therefore did not constitute ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The district court, however, found that the sentencing decision had been a close one and concluded that the death sentence might have been averted had Couser presented an effective case for mitigation. The district court therefore found both deficient performance and the resulting prejudice necessary to find ineffective assistance of counsel at the penalty phase. Clabourne appeals the denial of his petition with respect to the conviction; the state cross-appeals the district court's grant of his petition with respect to the penalty phase.

## II

Clabourne's principal contention on appeal, as in district court, is that he received ineffective assistance of counsel at the guilt and the sentencing phases of his trial. In order to obtain relief on this claim, Clabourne must overcome a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," and establish that Couser's performance was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Clabourne thus must show that Couser "made errors that a reasonably competent attorney acting as a diligent and

4. Ariz.Rev.Stat.Ann. § 13–703(F) provides: "Aggravating circumstances to be considered shall be the following: ... (6) The defendant committed the offense in an especially heinous, cruel or depraved manner."

5. Ariz.Rev.Stat.Ann. § 13–703(G) provides: "Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following: (1) The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his

conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

6. Judge Roylston also found that Clabourne had committed the offense for pecuniary gain, an aggravating circumstance under Ariz.Rev.Stat. Ann. § 13–703(F)(5), but at the urging of the prosecution he withdrew this finding because it was not supported by the evidence.

7. Clabourne does not appeal from the district court's failure to reach the merits of any of his claims. We thus address only those claims addressed by the district court.

conscientious advocate would not have made." *Butcher v. Marquez*, 758 F.2d 373, 376 (9th Cir.1985).

Clabourne must also establish prejudice: He must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *see also Lockhart v. Fretwell*, —— U.S. ——, ——, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (petitioner must show that "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair"). The right to effective assistance of counsel applies with equal force at the penalty phase of a bifurcated capital trial. *See, e.g., Wade v. Calderon*, 29 F.3d 1312, 1323 (9th Cir. 1994); *Mak v. Blodgett*, 970 F.2d 614, 617–19 (9th Cir.1992). In this context, prejudice means a reasonable probability that but for counsel's errors, a different sentence would have been imposed. *Mak*, 970 F.2d at 619.

## III

With these principles in mind, we turn to the substance of Clabourne's appeal. Clabourne first challenges the introduction of his confession: He claims that the confession should have been suppressed because it was obtained in violation of the sixth amendment and the prophylactic rule established in *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); and that Couser provided ineffective assistance in failing to argue that the confession should be suppressed on fourth amendment grounds or to introduce evidence that the confession was involuntary. Clabourne's second challenge concerns the jury instructions: He argues that Couser was ineffective in failing to present evidence to support an instruction on the lesser included offense of second-degree murder, and that such an instruction was warranted in any event based on the evidence that Clabourne was intoxicated. Clabourne raises several other challenges to his conviction, which we also address.

### A. The Confession

Clabourne was in custody on an unrelated burglary charge for over six months before he was interviewed by Detectives Bustamante and Reuter. During that time, he experienced auditory hallucinations, suffered delusional fears that other inmates were going to attack him, and had difficulty controlling his own aggression; the prison psychiatrist prescribed large doses of Thorazine, an anti-psychotic drug. Clabourne had been arraigned on the burglary charge and, at the behest of his appointed counsel, had signed a form stating that he did not want to be questioned without his lawyer present. Clabourne nonetheless waived his *Miranda* rights before giving his confession, and he has produced no evidence of police coercion.

■ Neither direct challenge to the admission of Clabourne's confession requires reversal. To be sure, it would have been a violation of the sixth amendment for the police to question Clabourne about his involvement in the burglary without his lawyer being present, as Clabourne had invoked his right to counsel with respect to that crime and "judicial proceedings [had] been initiated against him." *Brewer v. Williams*, 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977). But the sixth amendment right to counsel is offense-specific, *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991), and Detectives Bustamante and Reuter did not violate Clabourne's sixth amendment right to counsel by questioning him about his involvement in a crime for which he had not yet been indicted and as to which adversarial proceedings had not commenced. *See id.* at 175–76, 111 S.Ct. at 2207–08 (quoting *Maine v. Moulton*, 474 U.S. 159, 179–80, 106 S.Ct. 477, 488–89, 88 L.Ed.2d 481 (1985)).

■ Clabourne's *Edwards* claim, though more compelling, is also unavailing. Unlike the sixth amendment right to counsel, *Edwards* is not offense-specific: Once a defendant has invoked his right to counsel under *Miranda*, the police may not interrogate him about his involvement in *any* crime outside the presence of his lawyer. *Arizona v. Roberson*, 486 U.S. 675, 682–85, 108 S.Ct. 2093,

2098–2100, 100 L.Ed.2d 704 (1988); *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85; *but see McNeil,* 501 U.S. at 177, 180, 111 S.Ct. at 2208–09, 2210 (invocation of offense-specific sixth amendment right to counsel does not trigger *Edwards* protections). However, the Supreme Court has held that *Roberson* does not fall into either of the two exceptions to the rule against applying a new rule of constitutional law in cases on collateral review. *Butler v. McKellar,* 494 U.S. 407, 415–16, 110 S.Ct. 1212, 1217–18, 108 L.Ed.2d 347 (1990) (citing *Teague v. Lane,* 489 U.S. 288, 307, 311–13, 109 S.Ct. 1060, 1073–74, 1075–77, 103 L.Ed.2d 334 (1989), and *Penry v. Lynaugh,* 492 U.S. 302, 329, 109 S.Ct. 2934, 2952, 106 L.Ed.2d 256 (1989)). Under the law as it stood prior to *Roberson,* Clabourne's confession was not obtained in violation of *Edwards. See Harriman v. Lynn,* 901 F.2d 64, 67–68 (5th Cir.1990).

■ We turn then to Clabourne's claim that Couser provided ineffective assistance in failing to move for the suppression of the confession on fourth amendment grounds.[8] This claim fails for lack of prejudice: Clabourne had no valid fourth amendment challenge he could raise to the admission of his confession. Clabourne had been arraigned on the burglary charge and was lawfully in custody; six months had passed since his allegedly illegal arrest;[9] a witness had tipped off the police about Clabourne's com-plicity in the homicide; and there was no evidence of police misconduct. These circumstances amply purge any taint from the allegedly illegal arrest. *Cf. Taylor v. Alabama,* 457 U.S. 687, 691–93, 102 S.Ct. 2664, 2667–69, 73 L.Ed.2d 314 (1982) (holding that taint existed where there was no meaningful intervening event between illegal arrest and confession).

■ Clabourne's claim that Couser provided ineffective assistance in failing to present accurate evidence concerning the effects of Thorazine also fails for lack of prejudice.[10] "Coercive [police] activity is 'a necessary predicate' to finding a confession involuntary," *United States v. Kelley,* 953 F.2d 562, 565 (9th Cir.1992), and Clabourne can point to no evidence of coercion by the police. The fact that Clabourne was under the influence of Thorazine does not alone render his confession involuntary. *See Colorado v. Connelly,* 479 U.S. 157, 165, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986) (examination of defendant's state of mind can never conclude due process inquiry into voluntariness of confession).

### B. Second–Degree Murder Instruction

We turn then to Clabourne's challenge to the trial court's failure to give a second-degree murder instruction. Interpreting *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980),[11] we have held it

**8.** This ineffective assistance claim is not barred by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). *See Kimmelman v. Morrison,* 477 U.S. 365, 382–83, 106 S.Ct. 2574, 2586–87, 91 L.Ed.2d 305 (1986).

**9.** Before arresting Clabourne on the burglary charge, the police conducted an illegal search of his apartment. Clabourne contends that his arrest and confession were fruits of this unlawful search. We need not address the legality of the arrest, however, because even assuming the arrest was unlawful Clabourne had no viable fourth amendment claim.

**10.** At the suppression hearing, Couser elicited testimony from Rubin Bressler, a professor of pharmacology, that Thorazine is used to correct thought disorders. At the evidentiary hearing in district court, however, Clabourne produced evidence that this is not an entirely complete representation of the effects of Thorazine: The drug does clarify thinking, but only if taken by a patient who is mentally ill; in stable individuals, Thorazine addles the brain.

**11.** In *Beck,* the Supreme Court considered the constitutionality of Alabama's per se rule against providing lesser included instructions in capital cases. The Court found that the failure to instruct on a lesser offense might unduly burden the capital jury's deliberations. By depriving the jury of the opportunity to convict of a lesser offense, Alabama forced the jury to choose between convicting of capital murder and complete acquittal, which could have improperly caused the jury to convict of first-degree murder so as to avoid letting a dangerous criminal out on the street. *Beck,* 447 U.S. at 632, 637, 100 S.Ct. at 2387, 2389–90; *see also Schad v. Arizona,* 501 U.S. 624, 645–48, 111 S.Ct. 2491, 2504–06, 115 L.Ed.2d 555 (1991). The Court therefore held that Alabama's per se rule violated defendant's right to due process. *Beck,* 447 U.S. at 638, 100 S.Ct. at 2390.

to be plain error for the court to fail to give a lesser included instruction on second-degree murder in a capital case where such an instruction is available under state law, and where "'the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater.'" *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir.1986); *see Carriger v. Lewis*, 971 F.2d 329, 336 (9th Cir.1992) (en banc). With respect to Clabourne's claim that the trial court should have provided a second-degree murder instruction based on evidence of Clabourne's intoxication, the issue is "whether the evidence at trial would have supported a second degree murder conviction." *Vickers*, 798 F.2d at 371. With respect to Clabourne's ineffective assistance of counsel claim, the issue is whether a second-degree murder instruction would have been given if not for Couser's failure to present evidence of Clabourne's lack of premeditation.

### 1. *Voluntary Intoxication*[12]

■ In determining whether the trial court should have given a second-degree murder instruction based on the evidence of Clabourne's intoxication, we must first consider whether Arizona recognizes intoxication as a defense to the premeditation element of first-degree murder. *See Spaziano v. Florida*, 468 U.S. 447, 455, 104 S.Ct. 3154, 3159–60, 82 L.Ed.2d 340 (1984) (*Beck* does not require lesser included instruction where no lesser included offense exists); *Greenawalt v. Ricketts*, 943 F.2d 1020, 1029 (9th Cir.1991) (availability of lesser included instruction is a question of state law). In Arizona, as elsewhere, first-degree murder is distinguished from the lesser included offense of second-degree murder only by the element of premeditation. *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580, 583 (1981). A defendant

kills with premeditation if he "acts with either the intention or the knowledge that he will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion." Ariz.Rev.Stat.Ann. § 13–1101(1).

■ We conclude that, regardless whether intoxication may negate premeditation, it could not have been an effective defense in this case. The evidence of Clabourne's intoxication is minimal. In his confession, Clabourne claimed to have been drinking most of the evening, and stated that he was "wasted." However, Clabourne was able to recount the events of the evening and the reasons for his actions in great detail. Indeed, as his confession indicates, Clabourne had a lucid recollection of everything he did the night of the murder.

The evidence that Clabourne acted with premeditation is overwhelming, and no jury could rationally have found otherwise. To prove premeditation, the state was required to show only that Clabourne had had time to reflect after forming the intent to kill; any length of time would have been sufficient, even if it was "as instantaneous as [the time] it takes to form successive thoughts in the mind." *State v. Neal*, 143 Ariz. 93, 692 P.2d 272, 276 (1984). By his own repeated confessions, Clabourne not only had time to reflect on his actions, but did in fact deliberate before murdering Laura Webster. Clabourne confessed that Webster begged him not to let her be injured, but Clabourne stood by as Langston beat Webster over the course of six hours. At some point in the evening, Langston suggested they kill Webster, and between the time Langston instructed Clab-

---

**12.** On appeal, Clabourne argues this as an ineffective assistance of counsel claim, not a straight challenge under *Beck* to the trial court's failure to give a lesser included instruction. However, Clabourne does not claim that Couser should have introduced more evidence of Clabourne's intoxication, only that he should have argued that a second-degree murder instruction was warranted based on the evidence of intoxication presented at trial. We have held it to be plain error for the court to fail to give a lesser included instruction in a capital case where one is war- ranted, *see Vickers*, 798 F.2d at 370, 373, so Couser's failure to argue for the instruction is largely immaterial. At any rate, the inquiry is essentially the same whether we address this as an ineffective assistance claim or a straight *Beck* claim. In either case we must determine whether a lesser included instruction was warranted based on evidence of Clabourne's intoxication. If such an instruction was not warranted, the *Beck* claim fails by definition and the *Strickland* claim fails for lack of prejudice.

ourne to kill Webster and the time Clabourne actually strangled her, there was further opportunity to deliberate. The manner in which Clabourne committed the murder also suggests deliberation: Clabourne first strangled, then stabbed Webster, and the state's forensic expert testified that Webster was still alive when she was stabbed. Finally, Clabourne claims to have been acting under duress, a defense that is wholly inconsistent with his claim that he lacked premeditation: In weighing the alternatives, Clabourne necessarily thought about the murder before committing it.

The trial court found that a second-degree murder instruction was not warranted because "under the evidence as it existed at the [ ] close of the case ... no reasonable person could find second-degree murder." The Arizona Supreme Court affirmed, explaining that Clabourne had "presented no evidence to suggest that his actions had been committed in the heat of passion or as the result of a quarrel," and that it was "obvious defendant had sufficient time to reflect upon his actions." *State v. Clabourne*, 142 Ariz. 335, 690 P.2d 54, 64 (1984). Having independently reviewed the trial record, and taking into account the minimal nature of the evidence of Clabourne's intoxication, we can't disagree with the state courts' conclusion on this point.

2. *Suggestibility and Impulsivity*

██ Clabourne nevertheless claims that the balance of evidence bore out his argument about lack of premeditation and that a second-degree murder instruction would have been required had Couser only properly supported his request. To show prejudice, however, Clabourne must at a bare minimum [13] establish that, if it weren't for Couser's deficient performance, the trial court would have been required by *Beck* to give a second-degree murder instruction. We evaluate this claim by comparing the testimony at trial with the testimony at the evidentiary

hearing, where the experts were fully prepared and examined by competent counsel.

The testimony at the evidentiary hearing differed from that at trial, but not in any way that would have significantly strengthened Clabourne's claim that he acted without premeditation. Dr. LaWall testified at the evidentiary hearing that Clabourne had a character trait of impulsivity and that he had symptoms consistent with paranoid schizophrenia. Dr. Gelardin testified that Clabourne was highly suggestible and more likely than not influenced in his behavior by Langston's domineering presence. And Dr. Berlin testified that Clabourne suffered from paranoid schizophrenia, and like the other doctors further embellished this conclusion with his opinion that Clabourne tended to act impulsively and was highly suggestible.

This retrofitted expert testimony does not meet even the low threshold we established in *Vickers* for determining whether a *Beck* lesser included instruction is required. Vickers, an inmate at the Arizona State Prison, was convicted of capital murder for strangling his cellmate to death. He testified that he did not recall the attack, and called a psychiatrist to testify that he had "a brain disorder that gave rise to episodes of impulsive aggression." 798 F.2d at 372. Several witnesses testified to Vickers' history of impulsive violence, recounting how he had outbursts during which he lashed out, banged his head against the wall and seemed not to know what he was doing. There were no witnesses to the crime, and no direct, unrefuted evidence that the defendant was not suffering from one of those attacks during the killing. Citing an Arizona case which held that expert testimony concerning a defendant's propensity to violence is relevant and admissible to prove the defendant acted without premeditation, *see Christensen*, 628 P.2d at 583, we held that this testimony was sufficient to "allow a rational conclusion that

---

**13.** The state argues that Clabourne should be required to establish not only that competent counsel would have presented evidence that would garner a second-degree murder instruction, but also that the jury might reasonably have been expected to acquit Clabourne of first-degree

murder had it been presented with that option. Because we find that Clabourne cannot meet the lower standard he himself proposes, we need not decide whether this greater quantum of proof is required.

the killing was not premeditated," *Vickers,* 798 F.2d at 373.

The psychiatric testimony Clabourne presents is a far cry from that proffered in *Vickers.* It is one thing for psychiatrists to say, as they did in *Vickers,* that the defendant has an organic brain disorder, may have been suffering a seizure at the time of the murder and was given to violent episodes in which he lost control over his actions; it is quite another to say only that the defendant may not have premeditated his actions because he is impulsive.[14] Clabourne may have had a diminished capacity to conform his conduct to the requirements of the law, *see* section IV *infra,* but this in no way detracts from the impact of Clabourne's confession, which establishes the calculated way Laura Webster was murdered: She was tortured, raped and beaten over the course of several hours, during which time she begged Clabourne not to let her be killed. A jury faced with the evidence at trial would have only two rational options: a conviction of first-degree murder, or a verdict of not guilty by reason of insanity.

### C. Other Guilt Phase Claims

We turn therefore to Clabourne's remaining challenges to his conviction. These require only brief consideration:

### 1. Failure to Interview Witnesses

■ Clabourne claims that Couser provided ineffective assistance in failing to interview key witnesses: Detectives Luis Bustamante and Wayne Reuter; Doctors Valerie Rau[15], John LaWall, Edward Gelardin, and Rubin Bressler; and Corrections Officers Dale Stevenson and Scott Simmons. Even if we were to hold that Couser was incompetent in failing to interview these witnesses, we could not find the prejudice necessary to conclude that he provided ineffective assistance of counsel. Clabourne has failed to show there is a reasonable probability he would have been acquitted had Couser inter-

viewed any of the doctors before trial. The testimony provided by Bustamante, Reuter, Stevenson and Simmons corroborates Clabourne's taped confession, but is essentially redundant. *Cf. United States v. Schaflander,* 743 F.2d 714, 718 (9th Cir.1984) (failure to present cumulative testimony does not amount to ineffective assistance).

### 2. The Lost Semen Samples

■ Clabourne contends that Couser should have capitalized on the fact that the state lost the semen samples taken from Webster's body by seeking to have the sexual assault counts dismissed from the indictment. This claim fails for lack of prejudice: In order to get the indictment dismissed on this ground, Clabourne must show that the state intentionally destroyed the semen samples or otherwise acted in bad faith. *See Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 337–38, 102 L.Ed.2d 281 (1988). Clabourne has produced no evidence that the police acted in bad faith, nor has he established that Couser would have come up with such evidence had he interviewed the investigators and forensic scientists who handled the samples.

### 3. Failure to Request a Voluntariness Instruction

■ Couser did not argue to the jury that Clabourne's confession was involuntary. *See State v. Linden,* 136 Ariz. 129, 664 P.2d 673, 682 (App.1983) (defendant has right to voluntariness instruction "if the evidence has raised a question for the jury"). Clabourne would certainly want to challenge the voluntariness (and thus the accuracy) of his confession if he were pursuing a reasonable doubt defense. But Clabourne was pursuing an insanity defense, and that defense might have been less credible if Clabourne had disavowed his confession. The district court correctly concluded that the failure to request a voluntariness instruction was a tactical decision and so did not amount to ineffec-

---

14. Because of our ruling, we need not address the state's alternate claim that the first-degree murder conviction can stand on a theory of felony murder because the jury also convicted Clabourne of the underlying felonies.

15. Dr. Rau was the pathologist who performed the autopsy on Laura Webster.

tive assistance of counsel.[16] *See Strickland,* 466 U.S. at 689–91, 104 S.Ct. at 2065–67; *United States v. Claiborne,* 870 F.2d 1463, 1468 (9th Cir.1989) ("[A] reviewing court is not free to engage in after-the-fact second-guessing of strategic decisions made by defense counsel.").

■ Clabourne also claims that Couser provided ineffective assistance in failing to request a duress instruction or an instruction limiting the jury's consideration of evidence of Clabourne's prior bad acts. Duress is not a defense to either premeditated or felony murder, Ariz.Rev.Stat.Ann. § 13–412(C); *State v. Berndt,* 138 Ariz. 41, 672 P.2d 1311, 1314 (1983). In addition, any failure to request a limiting instruction regarding prior bad acts was harmless in light of the introduction of Clabourne's confession. Accordingly, these claims fail for lack of prejudice.

### 4. *Failure to Object to References to Clabourne's Competency to Stand Trial*

■ The prosecutor repeatedly referred to the fact that Clabourne had been found competent to stand trial, and Couser never objected that these comments were inflammatory or irrelevant. However, the jury was informed of the difference between the competency determination and the question of Clabourne's sanity at the time of the offense; reasonably competent counsel might have many valid reasons for failing to object to the form of opposing counsel's questions or interrupt opposing counsel during opening and closing statements. Failure to object in these circumstances is not an error, much less one "a reasonably competent attorney acting as a diligent conscientious advocate would not have made." *Butcher,* 758 F.2d at 377.

### 5. *Ineffective Assistance of Counsel on Appeal*

Clabourne claims that Couser should have argued on appeal that the admission of more than 20 photographs of Webster's body was grossly prejudicial under *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983). However, Couser *did* argue on appeal that the photographs should have been excluded; his fault seems only to have been in failing to cite *Chapple* in his briefs. Even were we inclined to find such a minor omission to be outside the pale of professional competence, we would find no prejudice. *Chapple* was decided by the Arizona Supreme Court over a year before it affirmed Clabourne's conviction, and that court no doubt was aware of its *own* precedent; indeed, in rejecting Clabourne's argument, the Arizona Supreme Court cited a more recent case that expounded on the *Chapple* ruling. *See Clabourne,* 690 P.2d at 62 (citing *State v. Summerlin,* 138 Ariz. 426, 675 P.2d 686, 693 (1983)).

### 6. *Constitutionality of Arizona's Capital Murder Statute*

Clabourne argues that Arizona's capital murder statute is unconstitutional because it does not rationally distinguish between first- and second-degree murder. The district court addressed (and rejected) this claim on the merits. Nonetheless, the state argues that the Arizona courts rejected this claim on independent and adequate state law grounds, and that the claim is therefore procedurally barred. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991).

Clabourne raised this claim for the first time in a petition for post-conviction relief. The state court found that collateral review of that claim was barred under Ariz. R.Crim.P. 32.2(a)(3) because Clabourne had "knowingly, voluntarily and intelligently" failed to raise it previously. *See Johnson v. Lewis,* 929 F.2d 460, 463–64 (9th Cir.1991). Clabourne does not contest this finding, nor has he established "cause for the default and actual prejudice," or "that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. at 2565. The claim is procedurally barred, and we do not address it.

---

**16.** We note also the lack of prejudice: As we discuss above, Clabourne's confession was clear-

ly voluntary. *See* pp. 1379–80 *supra.*

7. *Failure to Move to Exclude Rick Diaz's Testimony*

After his initial interview with the police, Diaz underwent hypnosis to recall further details about Webster's abduction. Arizona has explicit requirements for the use of "post-hypnotic" testimony, *see State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266, *amended,* 644 P.2d 1279 (1982); *State v. Lopez,* 181 Ariz. 8, 887 P.2d 538 (1994), but because Couser never objected to Diaz's testimony the state was never required to prove that those requirements had been met. Without considering whether Diaz's testimony would have been ruled inadmissible had it been challenged (something Clabourne has not established), we find that, in light of Clabourne's confession, Couser's failure to ask that Diaz's testimony be suppressed did not result in *Strickland* prejudice.

## IV

We turn to the state's cross-appeal. The district court found that Couser failed to adequately prepare and present a case for mitigation at the sentencing hearing. It agreed with Clabourne that this amounted to ineffective assistance of counsel because competent counsel would have made an effective case for mitigation. Though we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, we agree with the district court's conclusions.

There can be no doubt that Couser's representation at the sentencing phase was deficient. He did not call any witnesses, introduce any evidence of Clabourne's history of mental illness, or argue any mitigating circumstance besides Clabourne's mental condition at the time of the offense. Instead, Couser briefly [17] argued that Arizona's "especially heinous, cruel or depraved" aggravating circumstance law was unconstitutionally vague, *see* Ariz.Rev.Stat.Ann. § 13–

703(F)(6),[18] and that even if it wasn't sufficient to establish legal insanity, the evidence presented *at trial* concerning Clabourne's mental illness could be considered in mitigation of the sentence. *See* Ariz.Rev.Stat.Ann. § 13–703(G)(1). The state's response is further proof that Couser's mitigation argument failed to bring forth anything new: The prosecutor rested on the evidence presented at trial, and made no argument.

Although Judge Roylston stated at the outset of the hearing that he would "consider all of the evidence that was produced at the time of trial," the evidence Couser presented at trial was hardly sufficient to make a case for mitigation: Couser called only one witness—Dr. Sanford Berlin, an expert he had contacted scant days earlier—and relied almost exclusively on his cross-examination of the state's experts. Couser's expert, moreover, was wholly unprepared to testify as to Clabourne's mental state at the time of the offense; not having interviewed Clabourne, and having less than two days to prepare his testimony, Dr. Berlin had to rely on his vague recollection of having treated Clabourne some six years earlier and the medical records of that treatment. These records hardly turned out to be helpful: They reflect the treating physician's diagnosis that Clabourne did not suffer from a thought disorder at all but rather had an "antisocial personality." *See State v. Apelt,* 176 Ariz. 369, 861 P.2d 654, 662 (1993) (mitigation under section 13–703(G)(1) requires evidence that defendant was suffering from "some identifiable mental disease or psychological defect").

Nor did Couser's cross-examination of the state's witnesses make the case for mitigation. The focus of Dr. LaWall's and Dr. Gelardin's testimony was the *M'Naghten* rule: They were asked to testify whether Clabourne was legally sane at the time of the murder, not whether Clabourne's "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law" was significantly impaired,

---

17. The sentencing hearing takes up only twenty-four transcript pages. Couser's entire argument, which consumed less than six transcript pages, is set out in the Appendix.

18. The United States Supreme Court declared this aspect of Arizona's death penalty statute to be constitutional in *Walton v. Arizona,* 497 U.S. 639, 652–55, 110 S.Ct. 3047, 3056–58, 111 L.Ed.2d 511 (1990).

which is the standard for mitigation under Ariz.Rev.Stat.Ann. § 13–703(G)(1), or whether Claybourne "was under unusual and substantial duress, although not such as to constitute a defense to prosecution," which is the standard under Ariz.Rev.Stat.Ann. § 13–703(G)(2). In short, Couser never asked these experts (or Dr. Berlin) to expound on mitigation.[19]

Couser also failed to prepare the experts to testify at trial. His shortcomings with Dr. Berlin are obvious, but Couser committed a commensurate error in failing to provide the state's experts with materials they needed to develop an accurate profile of Claybourne's mental health. Before trial, Dr. Gelardin interviewed Claybourne for approximately an hour, read several witness statements and Claybourne's confession, and reviewed counseling records from Claybourne's stay at the halfway house. He did not see the statement provided by Claybourne's co-defendant Edward Carrico, which recounted how Langston was the mastermind of the crime and had forced the others to participate. Nor was he provided the statement from Langston's cellmate, George Breshears, who recounted how Langston had confessed to the crime and bragged about manipulating Carrico and Claybourne into helping him act out his sexual fantasies. Couser also did not provide Dr. Gelardin with the psychiatric records he needed to develop an accurate profile of Claybourne's mental state: the records of Claybourne's treatment at the University of Arizona Medical Center in 1975, the report from the Jay McCaffery School (where Claybourne was sent after being discharged from the University Medical Center), or the records of Claybourne's prescription for Thorazine and his behavior while in prison. Nor was Dr. LaWall provided with such materials.

This is not a case where there were tactical reasons for failing to present available evidence of mitigation. *See Burger v. Kemp,* 483 U.S. 776, 791–92, 107 S.Ct. 3114, 3124–25, 97 L.Ed.2d 638 (1987); *Campbell v. Kincheloe,* 829 F.2d 1453, 1462 (9th Cir.1987). In *Burger,* the Supreme Court found that counsel's failure to put the defendant on the stand was a tactical decision: The defendant was immature, would not stand up well on cross-examination and might actually boast about the crime. 483 U.S. at 779, 791–92, 107 S.Ct. at 3117–18, 3124–25. In *Campbell,* we found that counsel's failure to put on any evidence in mitigation was justified because "the state was prepared to present a vast array of aggravating evidence in rebuttal." 829 F.2d at 1462. By contrast, Couser had nothing to lose by asking the expert witnesses to testify at the sentencing hearing; their testimony would not open the door to hidden evidence of aggravating circumstances.

Nor is this a case where the evidence had already been presented at trial, *see, e.g., Coogan v. McCaughtry,* 958 F.2d 793, 800 (7th Cir.1992); *Clozza v. Murray,* 913 F.2d 1092 (4th Cir.1990), or was so insubstantial that its omission did not cause any prejudice, *see, e.g., Campbell,* 829 F.2d at 1464. At trial, Dr. Gelardin had been reluctant to admit that Claybourne had symptoms that were consistent with a diagnosis of paranoid schizophrenia and had testified that Claybourne did not suffer from any sort of psychosis; at the evidentiary hearing, he testified that Claybourne "probably [had] suffered from a psychosis," that Claybourne had a history of degenerating into psychotic thought processes, and that if he had been provided all the background materials he needed he "probably would have testified that [Claybourne] had schizophrenia."[20] In contrast to

---

**19.** After Claybourne had been convicted but before the sentencing hearing, Couser argued that Dr. Berlin should be given an opportunity to examine Claybourne and to supplement his testimony concerning Claybourne's mental state at the time of the offense. His argument on this point is enlightening:

> Dr. Berlin, because of various reasons, did not have an opportunity to elaborate upon [that mitigating factor]. Most of the thrust of my efforts at trial was to show his psychoses and possible insanity.

> I just feel that what I'm driving at is not completely before the court, and has not been brought out thorough[ly] enough.

In light of this admission that his case for mitigation was incomplete, Couser's failure to call Dr. Berlin, or to put on any additional evidence at the sentencing hearing, is inexplicable.

**20.** Claybourne has not argued that Couser's ineffectiveness at trial prejudiced his ability to put on an insanity defense, nor could he: At the evidentiary hearing, Dr. Gelardin and the other experts

his laconic testimony at trial, Dr. Gelardin further embellished this diagnosis with his opinion concerning the interaction between Langston and Clabourne on the night of the murder. He reported that Clabourne had a childlike way of responding to the world, that he had grandiose thought processes and that Langston could have manipulated, if not compelled, Clabourne to participate in the crime.

Dr. Berlin's testimony was also far more helpful at the evidentiary hearing than it had been at trial. He testified emphatically that "Scott Clabourne suffer[ed] with a chronic process thought disorder," specifically some form of schizophrenia. As such, Clabourne often lost contact with reality and, like anyone with schizophrenia, was "extremely fearful and gullible" and could easily have been manipulated by someone with a forceful personality. Dr. Berlin still could not state an opinion as to whether Clabourne was legally insane at the time of the murder, but testified that he had "some serious doubts as to whether [Clabourne] really could function in a logical, concise and aware manner."

More telling, at least in terms of determining how valuable their testimony would have been in arguing for mitigation at sentencing, both Dr. LaWall and Dr. Berlin agreed with Detective Bustamante's characterization of the relationship between Clabourne and Langston:

> The difference in personality is as if you would get an adult, well-educated individual [to] convince [a] four-year-old to poke his little sister in the eye, the four-year-old being Mr. Clabourne, and I am not using that to insult him in any way, shape or form, but I am saying [that is] the difference in personality and [the] differen[ce] street-wise between Clabourne and Langston.

With respect to Langston, Dr. Berlin further testified he "probably ... had the ability to manipulate Scott and to be rather domineering in controlling whatever Scott's behavior

was going to be." And Dr. LaWall stated that "the idea that Langston manipulated Clabourne is consistent with what I know about their personalities," and that Langston was the mastermind behind the crime.

In addition to this expert testimony, Couser could have introduced the testimony of Detective Bustamante, who had concluded that Langston, not Clabourne, was responsible for the depraved manner in which the crime was committed. In Bustamante's words, "There was a major, and there was a minor. Mr. Langston was a major, thinking, planning, and not to minimize Mr. Clabourne as a human being at all, but he was a minor." Couser could also have exploited the statement given by Langston's cellmate, George Breshears, to whom Langston had confided his pride at having manipulated two other people into helping him play out his sexual fantasy of rape and murder.[21] Based on Langston's description of the crime, Breshears was of the opinion that "[Clabourne] was only an instrument ... that's Larry pulling that bandana. I mean to see him describe it, he's doing it in his own mind. He's killing her. I mean he's just using [Clabourne] the way [Clabourne] is the bandana."

Couser recognized that a case for mitigation could be made based on Clabourne's mental state at the time of the offense, his relative culpability for the heinousness of the offense and the duress he felt as a result of Langston's threats and domineering personality. Five days prior to the sentencing hearing, Couser requested that Dr. Berlin be permitted to interview Clabourne and report to Judge Roylston as to whether Clabourne's "mental state might be something that could be used in mitigation." *See* note 19 *supra.* Explaining why such an examination was warranted, Couser argued that "it's quite conceivable that a psychiatrist at this juncture could talk to Scott, and he might be brought within the purview of [Ariz.Rev.Stat. Ann. § 13–703(G)(1) ]." When this request

---

continued to testify that Clabourne had been legally sane at the time of the offense.

**21.** Both in a letter to Detective Bustamante and in a taped interview, Breshears recounted how Langston "admitted he devised a plan to use ... his two accomplices, [Clabourne] & [Carrico], to

fulfill [sic] a fantasy that he had had, since he had watched a movie called *Looking for Mr. Goodbar.* He described a scene where the girl in the movie was stabbed to death at the point of orgasm."

was rejected, however, Couser simply gave up: He put on no evidence at the sentencing hearing, and made a perfunctory argument based on the weak testimony that had already been presented at trial. Asked why he failed to present evidence that Langston was the mastermind behind the crime or to pursue more thoroughly a defense based on Clabourne's mental state at the time of the offense, Couser responded, "The climate about [the] case was very bad for [Clabourne]. I don't think anything could have saved him from the death penalty with Richard Roylston."

Couser's despair notwithstanding, this case was not a lost cause. *Cf. Wade*, 29 F.3d at 1323–25. Judge Roylston found only one aggravating circumstance, the weight of which would have been called into question had Couser presented evidence that Langston was the mastermind behind the crime and that Langston was using Clabourne to help him act out his twisted sexual fantasies. Judge Roylston found no mitigating circumstance, but the only evidence he had before him was that presented at trial; Couser had presented no evidence geared toward establishing that Clabourne was significantly impaired in his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." Ariz. Rev.Stat.Ann. § 13–703(G)(1). As the testimony at the evidentiary hearing illustrates, a more compelling case could have been made.

Couser's representation at the sentencing hearing "amount[ed] in every respect to no representation at all," *Blake v. Kemp*, 758 F.2d 523, 533 (11th Cir.1985), and the "total absence of advocacy falls outside *Strickland's* 'wide range of professionally competent assistance,'" *Kubat v. Thieret*, 867 F.2d 351, 368 (7th Cir.1989). And, as the district court noted, Couser's deficient performance was decidedly prejudicial: There is a reasonable probability that, but for Couser's failure to pursue Clabourne's defense diligently at the sentencing phase, the judge would have imposed a sentence other than death. The state argues that Clabourne cannot establish prejudice because his petition for post-conviction relief described the evidence that should have been offered in mitigation, and the sentencing judge rejected the petition. The sentencing judge, however, denied the petition summarily without any explanation. Accordingly, we cannot conclude that he weighed the omitted evidence and found it insufficient. We therefore conclude that Clabourne received ineffective assistance of counsel at the penalty phase.

## CONCLUSION

We affirm the judgment of the district court.

## APPENDIX

### Transcript of Couser's Argument at Sentencing

We are concerned today, of course, with the factors of aggravation or mitigation. One of the problems with the facet of sentencing that goes to aggravation is that the legislature has seen fit to give us some language as a standard to go by which is, I think, constitutionally unconstitutionly [sic] vague.

And I'm referring specifically to that language in [Ariz.Rev.Stat. § 13–703(F)] which says that with respect to the applicability of the death penalty the following might be considered as an aggravating factor: "The defendant committed the offense in an especially heinous, cruel or depraved manner."

This leaves up to the sentencing Judge the subjective judgment of how to define the terms especially heinous, cruel or depraved manner.

Your Honor might define those one way and any one of a myriad of other judges might define them and apply those terms in another way. What I'm saying is we do not have a standard to go by that is sufficiently clear and a sufficiently good guideline so that we meet out [sic] the death penalty to people in a uniform manner, or as uniform as is humanly possible, and don't meet [sic] it out to out [sic] others in a manner as uniformly [sic] as possible.

Without meaning to be funny at all, the way I read that statute, and giving those words what their normal meaning might be in our language, you could have a crime that

is heinous, cruel or depraved, but if it is not especially so, it's not an aggravating circumstance.

That's hard for me to reconcile. That means that the legislature must have meant that we have degrees of heinousness, degrees of cruelty, and degrees of depravity. And on top of that you must decide whether those things exist and if so are they especially heinous, cruel or depraved.

I submit to the Court that that puts an awesome burden on any judge to have to divine what the legislature meant by using that language. I think that that particular type of language has been deemed vague down there and is under attack.

I'm not going to prolong the obvious by taking all afternoon about that, but I know you have read my memorandum and my position is set forth as clear as I can make it, that that is a standard that our legislature has given us that is so vague that there's no way that we can apply with any uniformity the death penalty in this state.

And, accordingly, that language gives us a standard that is faithly [sic] defective in a constitutional point of view.

The other main thing I want to point out to the Court is in the realm of mitigation. I hope for the moment we can lay aside the concept of vengeance and look at the things that can be considered by the Court in mitigation for Scott Clabourne.

[Ariz.Rev.Stat.Ann. § 13–703(G)(1) ] in referring to mitigating factors says that you might consider the following: "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired. But not so impaired as to constitute a defense to prosecution."

Well, here obviously our attempt at an insanity defense was not successful. But the case is replete with evidence both oral and documentary, and of which this Court is aware, that my client has had a lifetime of exhibiting bizarre behavior.

He first got into trouble when he was eight years old, and since that time he has been in and out of various institutions, displaying a broad spectrum of psychiatric and emotional disorders.

They run the gambit [sic] from bizarre thought patterns through to paranoid features, schizophrenia, hallucinations, suicidal tendencies, and on and on.

So what I'm pointing out to the Court is this man has had inherent, perhaps even genetic defects that have made him the way he is. I don't know whether it [sic] proper for me to comment on my reactions to him, but Scott has told me he's just the way he is. That's the way God made him.

What I am saying, of course, is that these possible inherent psychological and emotional defects, the flat affect, the inability to be and to react normally, may constitute circumstances that bring him right under the statute I have just quoted.

Perhaps his behavior and his capacities were not such as to constitute a defense. But there is more than enough evidence of disorders to say that he was unable to conform his conduct to that required by the law. And that can be considered by your Honor as a mitigating factor, notwithstanding the nature of the crime and the facts of the crime.

Another thing that you might consider is his youth. Another thing you might consider is the fact that it appears that Scott has had more or less a turbulent family history, turbulent in the sense that I believe he was rejected early on, rejected in a manner by his mother to the extent that he ultimately considered her just a sex object. Not of his own, of course, but just some sort of worthless woman.

And maybe that's tainted him and made him have attitudes about women in general. With a history of emotional disturbances, and with a more or less turbulent background, much of it associated with his family.

Scott was born out of wedlock, never knew his father. We might have someone whose circumstances would bring him under Eddings (ph) versus Oklahoma, a Supreme Court case where such similar mitigating factors as turbulent family history and abuse and emotional disorders were recognized as proper mitigating factors.

And I think it was that case probably that was the basis for Judge Meehan in State versus Eastles (ph) to not apply the death penalty. You, of course, don't have to do what Meehan did, and that case is entirely different from this one.

But I have appended a copy of Eddings versus Oklahoma to my memoranda [sic], and I think it does apply. And it gives you a standard and a basis to give Scott Clabourne leniency if you see fit.

One other thing that I would like to point out to the court is the area of remorse. It is very evident and apparent from Scott Clabourne's demeanor that he has a very flat affect.

I was asked by Mr. Clint Brown if I wanted to make a statement to append to the presentence report, and I didn't do it. But I'll tell you that Scott Clabourne has told me that he has cried about Laura Webster.

And I asked him why, and he said because of what happened to her. That's all I can offer in the way of a personal statement. That is all that I have gotten from him that indicates remorse, and I think that's maybe all that he's capable of.

But in his own way that was his remorse. That is what he told me. That's what I would have appended to a presentence report.

But mainly the thrust of my position today is that the standard that we have been given to apply the death penalty is constitutionally [sic] vague and therefore thereby [sic] fatally defective. And that there are things to consider in mitigation, your Honor. Thank you.