Larry Eugene EVANS,
Petitioner–Appellant,

v.

Samuel LEWIS; Lloyd Bramlett,
Respondents–Appellees.

No. 87–2195.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 14, 1988.

Decided Aug. 22, 1988.

William H. McLean, Stewart & McLean, Ltd., Phoenix, Ariz., for petitioner-appellant.

R. Wayne Ford, Asst. Atty. Gen. for the State of Ariz., Phoenix, Ariz., for respondents-appellees.

Before CHOY, SNEED and HUG, Circuit Judges.

CHOY, Circuit Judge:

Larry Eugene Evans ("Evans"), an Arizona state prisoner convicted of first degree murder and armed robbery and sentenced to death, appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Evans alleges numerous trial and sentencing errors. We affirm his conviction, but reverse the sentence of death, and remand for resentencing.

## BACKGROUND

On August 27, 1976, an Arizona jury found Evans guilty of first degree murder and armed robbery in connection with the robbery of a Phoenix bar and the shooting of the bartender. The trial judge subsequently sentenced Evans to death for the murder. The judge found one aggravating factor, a previous California conviction for attempted first degree robbery, and no

factors mitigating against the imposition of the death penalty.[1] Evans appealed his conviction and sentence to the Arizona Supreme Court, which affirmed the conviction but remanded for resentencing in order to allow Evans to present any evidence of mitigating circumstances. *See State v. Evans*, 120 Ariz. 158, 584 P.2d 1149 (1978).[2]

Upon resentencing, the judge found no mitigating circumstances and again sentenced Evans to death. On appeal, the Arizona Supreme Court affirmed this decision. *See State v. Evans*, 124 Ariz. 526, 606 P.2d 16 (1980). The United States Supreme Court denied certiorari. *See Evans v. State*, 449 U.S. 891, 101 S.Ct. 252, 66 L.Ed.2d 119 (1980).

On April 30, 1980, Evans filed a petition for post-conviction relief in state court. When both the trial court and state supreme court denied this petition, he applied in federal district court for habeas relief. The court dismissed his petition on the ground that Evans had failed to exhaust available state remedies.

On May 20, 1983, Evans filed a second state petition for post-conviction relief. In reviewing the trial court's denial of his petition, the Arizona Supreme Court remanded for a hearing to ascertain the basis for the finding of the aggravating factor. After a hearing, the trial court concluded that sufficient proof existed to establish the existence of the aggravating factor. The state supreme court affirmed. *See State v. Evans*, 147 Ariz. 57, 708 P.2d 738 (1985).

On April 11, 1986, Evans again filed a petition in federal district court for habeas relief. The district court denied his petition. Evans timely appeals from that decision.

## STANDARD OF REVIEW

We review *de novo* a district court's determinations with respect to a petition for writ of habeas corpus. *McKenzie v. Risley*, 842 F.2d 1525, 1531 (9th Cir.1988) (en banc). "Furthermore, while the historical factual findings of a state court are presumed correct and will not be set aside unless lacking fair support in the record, we may give different legal weight to such facts." *Bruni v. Lewis*, 847 F.2d 561, 563 (9th Cir.1988) (citations omitted).

## DISCUSSION

Evans raises several issues in this petition, three of which concern his conviction. We address these allegations of trial errors before turning to his sentencing objections.

### I. Trial Objections

#### A. *Cross-examination*

■ Evans claims that the trial court's restriction of his cross-examination of the prosecution's key witness violated his sixth amendment right to confront witnesses against him. While Evans was in jail awaiting trial, Tommy Ray Hammock ("Hammock"), Evans' cellmate, told police that Evans had admitted to him his guilt in the matter and had provided details. At trial, Hammock testified against Evans, providing the only testimony directly implicating Evans in the murder.

The sixth amendment confrontation clause requires "a certain threshold level of cross-examination." *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir.1980). The extent of cross-examination must be suffi-

---

**1.** Arizona's death penalty statute includes categories of aggravating circumstances that support the imposition of the death penalty, *see* Ariz.Rev.Stat. § 13–703(F), and categories of mitigating circumstances that contend against the imposition of the death penalty, *see* Ariz. Rev. Stat. § 13–703(G) (formerly § 13–454(E)). In the present case, the trial court found the California conviction to constitute an aggravating circumstance within the meaning of section 13–703(F)(2), which states whether "[t]he defendant was previously convicted of a felony in

the United States involving the use or threat of violence on another person."

**2.** Arizona's death statute at the time of Evans' sentencing limited mitigating factors to certain categories. The Arizona Supreme Court held that in light of intervening United States Supreme Court decisions these limitations on mitigating factors were unconstitutional. The court thus remanded for resentencing to allow Evans to present any evidence that might establish mitigating circumstances. *Evans*, 584 P.2d at 1153.

cient to allow the jury to evaluate the witness's "general credibility," *Hughes v. Raines,* 641 F.2d 790, 792 (9th Cir.1981), and, in particular, to "appraise the biases and motivations of the witness," *United States v. McClintock,* 748 F.2d 1278, 1290 (9th Cir. 1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985) (quoting *United States v. Bleckner,* 601 F.2d 382, 385 (9th Cir.1979)). Yet, a defendant does not have a right to "cross-examination that is effective in whatever way, and to whatever extent, [he] might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985). The trial court may thus exclude cross-examination "that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

Furthermore, "the defendant's right to attack the witness's general credibility enjoys less protection than his right to develop the witness's bias." *Reiger v. Christensen,* 789 F.2d 1425, 1433 (9th Cir.1986). Yet, where the prosecution's case depends upon the credibility of its key witness, "[d]efense counsel ... must be given a maximum opportunity to test the credibility of the witness." *United States v. Brady,* 561 F.2d 1319, 1320 (9th Cir.1977). *See United States v. Uramoto,* 638 F.2d 84, 86 (9th Cir.1980).

In the present case, the jury learned (1) that Hammock met Evans while both were in jail; (2) that Hammock and a friend had previously escaped from Adobe Mountain School in a stolen car that contained guns; (3) that police had subsequently chased these two and that Hammock's friend had shot and killed a policeman; (4) that Hammock could have been charged with felony-murder but that he was charged only with a misdemeanor and received probation as a result of his testimony against Evans; (5) that Hammock had plans for burglarizing homes when arrested; (6) that Hammock

had previously relayed to police incriminating statements made to him by an inmate charged with murder; and (7) that Hammock feared prison because he had previously "burned" certain inmates on deals.

Evans contends that the failure to allow questioning as to the kinds of deals Hammock made that "burned" certain inmates was unconstitutional. Evans claims that this interrogation would have revealed that Hammock had previously testified against others in exchange for criminal immunity.

As Evans acknowledges, such evidence referred to Hammock's general credibility rather than his bias or motivation. This evidence may have indeed further impugned Hammock's credibility, but it is cumulative given that Hammock had already testified that he had a special incentive to avoid prison and that his testimony would allow him to realize this goal. The nondisclosure of the precise nature of Hammock's deals did not prevent the jury from adequately evaluating Hammock's credibility.

## B. *Removal of a Juror*

■ During voir dire, the court on its own motion excused a prospective juror who indicated that he believed the taking of a human life could not be justified under any circumstances. Evans asserts that the court's action violated his sixth amendment right to an impartial jury selected from a cross-section of the community.[3]

This claim asserts a violation of two distinct rights: the right to a jury selected from a representative cross-section of the community, *see Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 696–97, 42 L.Ed.2d 690 (1975), and the right to an impartial jury, *see Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035–36, 44 L.Ed.2d 589 (1975).

The Supreme Court has held that "the fair cross-section requirement applies only

---

**3.** The district court refused to consider this claim because it held that Evans' failure to directly appeal the prospective juror's dismissal on constitutional grounds constituted procedural default under Arizona law and precluded federal review. *See Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506–07, 53

L.Ed.2d 594 (1977). However, in Evans' second state post-conviction proceeding, the court denied Evans' petition on the merits, thus vitiating the procedural bar. *See Engle v. Isaac,* 456 U.S. 107, 135 n. 44, 102 S.Ct. 1558, 1575–76 n. 44, 71 L.Ed.2d 783 (1982).

to venires, not to petit juries." *Buchanan v. Kentucky,* —— U.S. ——, 107 S.Ct. 2906, 2913, 97 L.Ed.2d 336 (1987); *see Lockhart v. McCree,* 476 U.S. 162, 173–74, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986). In the present case, the juror's removal was part of the process of selecting the petit jury and did not involve the composition of the venire. Therefore, the fair cross-section right did not attach. *See Harris v. Pulley,* 852 F.2d 1546, 1563 (9th Cir.1988).

A state violates the impartial jury requirement if it attempts to "execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* examination that they had conscientious scruples against or were otherwise opposed to capital punishment." *Adams v. Texas,* 448 U.S. 38, 43, 100 S.Ct. 2521, 2525, 65 L.Ed.2d 581 (1980) (explaining *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)).

In *McCree,* the Court rejected the argument that *Adams* and *Witherspoon* "have broad applicability outside the special context of capital sentencing." 476 U.S. at 183, 106 S.Ct. at 1770. The Court in *McCree* denied a claim that the systematic exclusion of jurors who stated that they could not under any circumstances vote for the imposition of the death penalty violated the impartial jury requirement, for the jury's role in this death penalty case concerned only the finding of facts and determination of guilt or innocence. *Id.* The Court indicated that outside the special context of criminal sentencing, the right to an "impartial jury consists of nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *Id.* at 178, 106 S.Ct. at 1767 (quoting *Wainright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 851, 83 L.Ed.2d 841 (1985)) (emphasis omitted).

In the present case, the jury played no role in Evans' sentencing. Its sole function was to determine Evans' guilt or innocence. Thus, the juror's removal, even if for insufficient cause, did not violate Evans' impartial jury right as Evans has not shown that as a result an impaneled juror failed to "conscientiously apply the law and find the facts." *Id.* at 178, 106 S.Ct. at 1767.

## C. *Intent Instruction*

■ At Evans' trial, the jury received the following instruction on "intent":

The State must prove that the defendant had done an act which is forbidden by law and that he intended to do it. You may determine that the defendant intended to do the act if he did it voluntarily. The State does not have to prove that the defendant knew the act was forbidden by law.

Evans claims that this instruction shifted to him the burden of disproving intent in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

A *Sandstrom* error arises when "a jury instruction ... creates a mandatory presumption, either conclusive or rebuttable, which shifts from the prosecution the burden of proving beyond a reasonable doubt an essential element of a criminal offense." *United States v. Washington,* 819 F.2d 221, 225 (9th Cir.1987). In contrast, an instruction that merely establishes a "permissive inference as to an essential element" is valid "unless 'the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.'" *Id.* (quoting *Francis v. Franklin,* 471 U.S. 307, 314–15, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985)).

In determining the nature of an inference, the test is simply how "a reasonable juror could have interpreted the instruction." *Sandstrom,* 442 U.S. at 514, 99 S.Ct. at 2454. This necessitates careful examination of "the words actually spoken to the jury." *Id.*

In the present case, the instruction "[y]ou may determine that the defendant intended to do the act if he did it voluntarily" states a permissive inference.[4] The

---

**4.** No federal cases have been found explicitly analyzing the phrase "you may determine." However, one federal court has reviewed and upheld jury instructions that included this phrase. *See Niziolek v. Ashe,* 694 F.2d 282, 292 (1st Cir.1982) ("[Y]ou may determine the de-

instruction informs the jury that it may decide whether the requisite intent exists if it first finds that the defendant's acts were voluntary. The instruction thus allows the jury to infer intent and does not require a presumption of intent. Furthermore, the conclusion reached by this permissive inference is supported by common sense.

## II. Sentencing Objections

### A. *Ineffective Assistance of Counsel*

Evans argues that his attorney's failure to present evidence of mitigation at his first sentencing hearing constituted ineffective assistance of counsel, depriving him of his sixth amendment right to counsel. Specifically, Evans maintains that his attorney should have introduced evidence indicating that he suffered from an impaired mental state at the time of the offense.

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), sets forth criteria to determine when counsel's ineffectiveness deprives a defendant of his sixth amendment right to counsel.

First, counsel's performance must be deficient. *Id.* at 687, 104 S.Ct. at 2064. "The proper standard for evaluating attorney performance is whether the assistance was reasonably effective under the circumstances." *Sturgis v. Goldsmith,* 796 F.2d 1103, 1110 (9th Cir.1986). Thus, the court must examine the facts of the case under review. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. In conducting its inquiry, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. A defendant overcomes this presumption by showing that his attorney's action could not be " 'considered sound trial strategy.' " *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

Second, the defendant must establish prejudice resulting from his attorney's conduct. *Id.* 466 U.S. at 692, 104 S.Ct. at 2067. "The defendant must show that there is a reasonable probability that, but for coun-

sel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. A court's determination of prejudice requires an assessment of "the totality of the evidence." *Id.* at 695, 104 S.Ct. at 2068–2069.

### 1. Deficient performance

■ Here, it is apparent that counsel's performance was deficient. Ariz.Rev.Stat. § 13–703(G)(1) (formerly § 13–454(E)(1)) establishes as a mitigating factor whether:

> The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

Documents available to Evans' attorney prior to the first sentencing hearing plainly indicate that Evans had a history of mental problems that may have made this provision applicable. Evans' California conviction records, used by the state to establish the aggravating circumstance, included a statement filed by the trial judge declaring that "Defendant is in need of psychiatric treatment." In addition, the pre-sentence report noted that Evans had been incarcerated in Atascadero State Hospital, a California mental facility for inmates, and that Evans had spent time in the mental health facility at California's Vacaville prison. The FBI "rap sheet" attached to the pre-sentence report indicated that Evans had attempted suicide while in California's Soledad prison.

Despite this information, counsel conducted no investigation to ascertain the extent of any possible mental impairment. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Campbell v. Kincheloe,* 829 F.2d 1453, 1463 (9th Cir. 1987). In fact, at the sentencing hearing,

fendant's intent from any statement or act done

or act omitted. . . .").

the court informed counsel that the probation officer had requested Evans' California prison records and reports but that they had not yet arrived, and offered to allow counsel to seek a continuance to await their arrival. However, counsel expressed no interest in viewing the contents of these documents and declined to request a continuance.

Counsel's failure to investigate Evans' mental condition cannot be construed as a trial tactic. At sentencing, Evans' counsel presented *no* evidence of mitigation.[5] Arizona's death penalty statute requires the imposition of death if one aggravating factor is found and no mitigating factors established. Ariz.Rev.Stat. § 13–703(E) (formerly § 13–454(D)); *see State v. Richmond,* 114 Ariz. 186, 560 P.2d 41, 53 (1976). The state's attorney made this clear at the sentencing hearing. Thus, the omission of evidence of mitigation and the obvious existence of at least one aggravating factor, Evans' previous California conviction, made the sentence of death inevitable. Under these circumstances, counsel's failure to pursue the possibility of establishing Evans' mental instability constituted deficient performance. *Compare Darden v. Wainwright,* 477 U.S. 168, 186, 106 S.Ct. 2464, 2470, 91 L.Ed.2d 144 (1986) (counsel's reliance on plea for mercy reasonable because to present mitigating evidence would open the door to damaging rebuttal evidence); *Campbell,* 829 F.2d at 1462 (counsel's decision not to present mitigating evidence was a sound trial tactic because to do so would allow the state to introduce damaging rebuttal evidence).

#### 2. Prejudice

■ A review of the totality of the evidence sufficiently undermines confidence in the outcome and establishes prejudice. At Evans' resentencing hearing on January 5, 1979, more than two years after his first sentencing hearing, his new attorney sought a continuance to secure time to establish Evans' mental imbalance as a mitigating factor.[6] The attorney and the state agreed to allow the court to decide the existence of the mitigating factor on the basis of examinations conducted by two court-appointed psychiatrists, Dr. Cleary and Dr. Gray.

Each psychiatrist filed a report with the court at the end of January 1979. They noted that Evans had received psychiatric treatment in Vacaville and had been incarcerated in Atascadero. They remarked that Evans heard "voices" and had a history of self-inflicted injuries. However, neither doctor could determine to a reasonable degree of medical certainty whether Evans suffered from diminished capacity at the time of the murder. Dr. Cleary wrote that he was "unable to give an opinion with any degree of medical certainty or probability because of the lapse of time involved, and also because of the lack of medical and psychiatric information concerning any previous mental illnesses [Evans] may have had."

Dr. Cleary's conclusion rests on two grounds. The first ground, the lapse of time between the crime and the examination, is directly attributable to the first attorney's failure to investigate Evans' mental condition. Nevertheless, the state argues that because the second ground, the lack of prior documentation, is independent of prior counsel's actions, no prejudice exists.

However, after the filing of the psychiatrists' reports, Evans' counsel obtained two letters that Dr. Wilcox, a California psychiatrist, had written to a California court in July 1971. In these letters, Dr. Wilcox had diagnosed Evans as a schizophrenic and reported that Evans suffered from a "major emotional illness," which made him unfit to stand trial.[7] At the continuation of

5. In contrast, the state sought to establish several aggravating factors.

6. The initial sentencing hearing was on September 20, 1976. The second sentencing hearing of January 5, 1979, was subsequently continued to March 12, 1979.

7. At the time, Evans was in a California prison and had been accused of felony possession of a knife while in prison. As a result of Dr. Wilcox's reports, the felony charge against Evans was dropped.

Evans' resentencing hearing on March 12, 1979, Dr. Cleary testified that on the basis of this additional evidence "there was a strong possibility that [Evans] had some impairment of his ability to conform his conduct to the requirements of the law on the day in question." However, he still could not form an opinion to a reasonable degree of medical certainty.[8]

Dr. Wilcox's reports, first reviewed by Dr. Cleary after he had submitted his own report, apparently changed Dr. Cleary's opinion that insufficient documentation of prior mental illness existed. This would mean that the lapse of time between the crime and psychiatric examination, which was directly attributable to prior counsel's incompetence in failing to have Evans examined at the first sentencing, was the determinative factor in Dr. Cleary's inability to give an opinion with any reasonable degree of medical certainty. An exchange between the judge and Dr. Cleary at the continuation of the resentencing hearing indicates that time was the critical factor:

Court: Doctor as a result of your examination and report in January 1979, you did not make a diagnosis of schizophrenia?

Cleary: That's correct.

Court: So, I take it that assuming the diagnosis [of schizophrenia] was made in 1971, it is not present as far as you are concerned, today?

Cleary: Yes.

Court: Or at the time you made your examination?

Cleary: Yes. *That's why I can't be more definite about it.*

Court: Therefore your opinion is not based on any degree of medical certainty?

Cleary: That's correct, your honor. (emphasis added).[9]

8. Dr. Gray did not testify at the resentencing hearing.

9. The "it" here must refer to Evans' mental capacity at the time of the crime. It could not refer to Evans' capacity at the time of the resentencing hearing because that is when Dr. Cleary made his examination, and Dr. Cleary had no problem being definite in his diagnosis that Evans suffered *no present mental impairment.*

The contents of Dr. Wilcox's reports underscore the severity of Evans' mental health problems and support a finding that failure to conduct a mental examination at the first sentencing hearing was prejudicial.

In a July 19, 1971, letter, Dr. Wilcox stated that Evans suffered from "a major emotional illness, which significantly impair[ed] his ability to distinguish right from wrong and to appreciate the nature and content of his acts." Dr. Wilcox further noted that Evans had "suffered from this illness for a long time."

In a July 19, 1971 letter, Dr. Wilcox diagnosed Evans as a "schizophrenic," who had:

display[ed] a lifelong pattern of maladaption to his environment, which appears to be based primarily on disordered thought process and an inability to appropriately interchange with the environment on many occasions because of internal experiences which are at variance with the reality of the outside world.

Dr. Wilcox predicted that "this condition will not improve without treatment," finding it significant that Evans "had noted a marked improvement" while taking Stelazine, an anti-psychotic medication.

Dr. Wilcox's reports establish Evans as a schizophrenic in need of medical help. While Evans apparently received treatment in prison, it appears he did not continue treatment upon his parole from prison on July 17, 1975.[10] Upon his current incarceration, Evans has once again been given Stelazine.

Dr. Wilcox's observations and conclusions are buttressed by Dr. Gray's findings. In his report, Dr. Gray, without the benefit of seeing Dr. Wilcox's letters,

10. At the resentencing hearing, Dr. Cleary testified that Evans had been advised to have psychiatric treatment when he was released from prison. Dr. Cleary also testified that Evans was apparently not taking medication the day of the murder.

opined that Evans' "symptom pattern, clinical signs shown during this interview along with his record of past treatment with antipsychotic medication point to a diagnosis of a major mental disorder of schizophrenia." Dr. Gray continued to state that "[a]s schizophrenia is usually a chronic illness it is reasonable that at the time [Evans] committed the murder he was suffering from the illness." [11]

Review of Dr. Wilcox's letters provides evidence that failure to conduct a timely mental examination of Evans was prejudicial. Such evidence, combined with 1) Dr. Cleary's assertion in his report that lapse of time was a factor hindering his ability to form an opinion as to Evans' mental state at the time of the murder; 2) Dr. Cleary's testimony at the continuation of the resentencing hearing, which reasonably indicates that lapse of time was the determinative factor; and 3) Dr. Gray's independent confirmation of Dr. Wilcox's diagnosis, establishes prejudice.

### B. *Other Sentencing Objections*

Evans attacks the trial court's finding of an aggravating factor at the initial sentencing and the court's refusal to find any mitigating circumstances upon resentencing. He also insists that the delay in arriving at a final sentence violated his sixth amendment speedy trial right. We find no merit to these claims.

### CONCLUSION

We do not disturb Evans' conviction. He was denied neither his right to confront witnesses, nor his right to an impartial jury selected from a cross-section of the community. Further, the judge correctly instructed the jury on intent. However, Evans' death sentence is constitutionally infirm because his attorney's failure to investigate and present evidence of mental instability at the original sentencing constituted ineffective assistance of counsel. Accordingly, we REVERSE the district court's decision and direct the court to issue a writ of habeas corpus releasing Evans from the sentence of death and to remand the matter to the state court for resentencing.

---

**11.** Nevertheless, Dr. Gray stated that he had insufficient information to form an opinion as to Evans' mental state at the time of the murder because "[a] thorough review of the police departmental reports provided do not give sufficient information regarding defendant's thinking processes, state of mind or behavior to retrospectively form an opinion."

In this comment, Dr. Gray attributes his inability to form an opinion to the lack of information describing Evans' mental state at the time of the murder. (The police reports were the only documents available to Dr. Gray that were made around the time of the murder.) It is likely that a mental examination made much closer in time to the murder would have cured this defect.