Joe Clarence SMITH, Jr., Petitioner–Appellant,

v.

Terry L. STEWART, Respondent–Appellee.

No. 97–99010.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 28, 1999.

Decided Aug. 31, 1999.

1. We express no view on the merits of the appellants' ADA claim.

Kelley J. Henry and Denise I. Young, Assistant Federal Public Defender, Phoenix, Arizona, for the petitioner-appellant.

Gerald R. Grant, Maricopa County Attorney, Phoenix, Arizona, for the respondent-appellee.

Before: FERGUSON, REINHARDT, and FERNANDEZ, Circuit Judges.

Opinion by Judge FERGUSON; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

FERGUSON, Circuit Judge:

Arizona state prisoner Joe Clarence Smith ("Smith") appeals the denial of his habeas corpus petition seeking review of his conviction and death sentence for the 1976 murders of Neva Lee and Sandy Spencer. Smith raised 34 claims, all of which the district court found were procedurally defaulted or lacked merit. For the bulk of these claims, we affirm the denial of the petition for the reasons set forth in the district court's order and memorandum.[1] We focus instead on one claim that Smith raised in previous state post-conviction petitions: ineffective assistance of counsel at resentencing. Because we conclude that Smith's counsel effectively presented no mitigating evidence on his behalf, our confidence in the outcome of his sentencing has been undermined to such an extent that we must reverse the district court.

## I. BACKGROUND

On January 1, 1976, officials of the Maricopa County Sheriff's Department found the nude body of Sandy Spencer in the desert outside Phoenix. One month later in a different desert location, police discovered the nude body of Neva Lee. Both teenage hitchhikers had been suffocated by having dirt forced into their mouths, which were taped shut. The assailant stabbed both women multiple times, punctured them with needles, and bound their wrists with rope.

Smith, who was on probation from a rape conviction, became the prime suspect. Police put him under surveillance. When that failed to produce probable cause for an arrest, police had a female officer pose as a hitchhiker to lure Smith into committing false imprisonment or battery. He eventually picked up the officer, took her to his father's machine shop, and grabbed her by both arms. After a prearranged signal, police entered and arrested him for false imprisonment.

During Smith's imprisonment, police questioned him about the Lee and Spencer murders. At first, he denied his involvement. But months later, at his own initiation, Smith gave investigators a bizarre account of the Lee slaying. He told police that he was present at the crime because a friend, John Jameson, forced him at gunpoint to drive the victim to the desert. Once there, Jameson ordered Lee to have sexual intercourse with Smith in order to frame Smith for her rape. Smith said Jameson then decided to kill Lee. His account conflicted with some physical evi-

---

1. Smith does not appeal all 34 claims. The claims which he does appeal and which the district court denied or found procedurally barred include the following: (1) ineffective assistance of counsel at trial; (2) Smith's guilty plea in the Spencer murder was taken in violation of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); (3) Smith's guilty plea was coerced by threats; (4) Smith's guilty plea lacked a factual basis; (5) Smith was improperly tried for murder by torture in the Lee homicide; (6) the murder by torture instruction did not set out the elements of the offense; (7) Smith was denied a unanimous jury on the elements of murder by torture; (8) Smith's arrest in this case was pretextual; (9) the Arizona courts failed to consider mitigating evidence fully in ordering the death penalty; (10) the trial court used unconstitutional convictions to establish aggravating circumstances; (11) the trial court improperly considered victim impact evidence during sentencing; (12) the trial judge improperly applied Smith's prior convictions to establish two aggravating factors; (13) the trial court improperly used the Spencer conviction to establish aggravating factors in the Lee conviction; (14) the trial court impermissibly duplicated an aggravating factor; (15) one aggravating factor was unconstitutionally vague; (16) the prosecution failed to disclose *Brady* material relevant to sentencing; and (17) the sentencing judge unconstitutionally refused to appoint a psychiatric expert. We reject these claims for the same reasons discussed by the district court.

dence found at the scene. Smith later contended that he told police no such story.

Smith went on trial for the Lee murder first. Throughout the trial, he maintained his innocence, contending that other people committed the crime and that investigators conspired to frame him. Jameson testified at the trial. He denied being present at the murder, but said that a man known as "Squirrel" bragged about killing two women and showed Jameson pictures of the dead women. The jury returned a general verdict finding Smith guilty of murder.

Smith then went on trial for the Spencer slaying. The following day, he pleaded guilty to the crime shortly after Di Anne Jameson–Smith's girlfriend, John Jameson's ex-wife, and a key prosecution witness-told the court that she had been improperly contacted by a defense investigator and by Smith's mother. During the plea colloquy, the prosecutor expressed doubts about Smith's emotional stability to enter a voluntary plea. Nonetheless, the trial court accepted the plea. Three weeks later, Smith unsuccessfully sought to withdraw the plea, explaining that he had only pleaded guilty out of concern that his parents and Ms. Jameson would be arrested.

At Smith's sentencing for both convictions, his trial counsel, Stephen Rempe, offered the deposition testimony of a psychiatrist, Dr. Jacob Hoogerbeets, and the live testimony of a psychologist, Dr. Faye Goldberg. At that time, Arizona's death penalty statute, formerly A.R.S. § 13–454, restricted the presentation of mitigating evidence to a list of statutory mitigating factors. Rempe offered Hoogerbeets' and Goldberg's testimony solely to establish one statutory mitigating factor: significant impairment of Smith's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law.

Dr. Hoogerbeets originally had been appointed by the court to evaluate Smith's competency to stand trial in March 1977. At that time, Hoogerbeets told the court that Smith did not suffer from *any* mental disability. Nonetheless, by July, with no additional interviews of Smith, Hoogerbeets testified in his deposition that Smith was a borderline psychotic who may have had a "compulsion" to commit the crimes. During the August sentencing, Dr. Goldberg also testified that Smith's emotional tension built up to such an extent that at the time of crimes he had an overwhelming "compulsion" to kill. The state rebutted this compulsion theory with the testimony of psychiatrist Dr. Michael Cleary, who also had interviewed Smith to determine his competency to stand trial. Dr. Cleary, after an hour interview, determined that Smith was not impaired in his ability to conform his conduct to the law and suffered from no significant mental defect. The court found no mitigating circumstances and three aggravating circumstances warranting the death penalty.

On appeal in 1979, the Arizona Supreme Court remanded Smith's case for resentencing in light of changes to the state's death penalty statute.[2] Rempe now could present any mitigating evidence on behalf of Smith, including additional evidence of mental illness not rising to the level of an impairment of Smith's capacity to conform his conduct to the law. Instead, at Smith's resentencing, Rempe simply resubmitted Dr. Hoogerbeets' and Dr. Goldberg's testimony under the same statutory mitigating factor, without recalling them to testify or presenting other evidence of mental or emotional disturbance. In fact, Rempe had never tried a death penalty case before and he had no idea what mitigating evidence he could present. He even asked

---

2. In July 1978, the Arizona Supreme Court held that A.R.S. § 13–454(F) was unconstitutional because it restricted a defendant's right to present relevant mitigating evidence other than the statutory factors. *State v. Watson,* 120 Ariz. 441, 586 P.2d 1253 (1978). Accordingly, the legislature revised the death penalty statute, now A.R.S. § 13–703. A.R.S. § 13–703(G) allows a defendant to present any relevant mitigating circumstance.

the court to help him out, a request that was ignored.

At resentencing, the judge found that Dr. Hoogerbeets' and Dr. Goldberg's testimony alone did not support the statutory mitigating factor of significant impairment, and so the court said it would not consider Dr. Cleary's testimony. The court also said it was not limiting its consideration of any mitigating circumstance in concluding that no mitigating factors existed which would call for a sentence other than death. In addition to resubmitting this expert testimony, Rempe reargued the constitutionality of Arizona's revised death penalty statute, a standard "form" motion of the public defenders office. He also repeated the recommendation of a supplemental presentence report, which suggested that the court appoint another examining psychiatrist. The court denied the request. Repeating his unsuccessful argument from Smith's first sentencing, Rempe briefly argued that life in prison would be a more "heinous" punishment than death. The court again found aggravating circumstances and no mitigating circumstances in sentencing Smith to death.

On direct appeal, the Arizona Supreme Court affirmed Smith's conviction and death sentence. *State v. Smith,* 131 Ariz. 29, 638 P.2d 696 (1981). He then brought a series of post-conviction relief petitions in the state courts. After the third of those petitions was decided adversely to him, Smith proceeded with the current federal habeas action in the district court. The district court denied the writ, finding all but seven of Smith's 34 claims procedurally barred either because the trial court determined they were defaulted, they were not preserved in a motion for rehearing, or they were never presented to any state court. The district court, however, reached the merits of Smith's claim of ineffective assistance of counsel at resentencing. Although Smith raises a number of claims on appeal, we need to consider only one.

## II. STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment denying a writ of habeas corpus. *Correll v. Stewart,* 137 F.3d 1404, 1411 (9th Cir. 1998). Since Smith filed this habeas petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214, the provisions of the Act do not apply. *Id.* (citing *Jeffries v. Wood,* 114 F.3d 1484, 1495–96 (9th Cir.1997) (en banc)).

## III. DISCUSSION

To establish ineffective assistance of counsel, Smith must demonstrate that his counsel's performance at his resentencing was deficient, falling "outside the wide range of professionally competent assistance." *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The deficient performance also must prejudice his case. There must be a reasonable probability, sufficient to undermine confidence in the outcome, that the result of the proceeding would have been different but for counsel's errors. *Id.* at 694, 104 S.Ct. 2052.

### A. *Deficient Performance*

We have no doubt that Rempe's performance was deficient. He failed to investigate, develop, and present evidence of Smith's mental condition which did not rise to the level of the statutory mitigating factor of significant impairment. He failed to introduce any additional mitigating evidence that might call for leniency. He failed to call any witnesses on Smith's behalf at the resentencing. This case is more akin to those situations in which defense counsel failed to present any mitigating evidence at all.

The failure to present mitigating evidence during the penalty phase of a capital case, where there are no tactical considerations involved, constitutes deficient performance, since competent counsel would have made an effective case for

mitigation. *See Bean v. Calderon,* 163 F.3d 1073, 1079 (9th Cir.1998); *Smith v. Stewart,* 140 F.3d 1263, 1269 (9th Cir. 1998); *Correll v. Stewart,* 137 F.3d 1404, 1412 (9th Cir.1998); *Clabourne v. Lewis,* 64 F.3d 1373, 1384 (9th Cir.1995) (failure to call witnesses, introduce evidence of defendant's history of mental illness, or to argue any mitigating circumstance besides defendant's mental condition at time of the offense). Likewise, "failure to investigate [the defendant's] mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995). *See also Wallace v. Stewart,* 184 F.3d 1112, 1116–17 (9th Cir.1999); *Caro v. Calderon,* 165 F.3d 1223, 1226 (9th Cir.1999) (all relevant evidence must be unearthed for consideration at a capital sentencing hearing).

For Smith's first sentencing in 1977, Rempe presented the testimony of Dr. Hoogerbeets and Dr. Goldberg. The entire focus of this testimony was to prove that Smith met the only mitigating factor available to him under Arizona law at that time: that Smith's ability to conform his conduct to the law at the time of the crimes was significantly impaired. Both doctors, therefore, focused on "inner conflicts" and "tension" that Smith suffered which would have caused a compulsion to act at the time of the crimes. Dr. Hoogerbeets described Smith's problem as "compulsory aberrant actions." The thrust of Dr. Goldberg's testimony was to present Smith as a "multiple sadistic sex slayer" who kills under a compulsion in order to reduce his mounting emotional tension. As Dr. Goldberg put it, the tension "mounts to such an extent that the intellectual processes are suspended and accompanying that may be a loss of memory about the events, partially or completely." This compulsion theory was necessary to provide any mitigation for Smith under the prior invalid statute. It is significant that both Dr. Hoogerbeets and the state's rebuttal psychiatrist, Dr. Cleary, originally had been asked to evaluate Smith to determine if he met the M'Naghten test for legal insanity. Arizona's statutory mitigating factor requires a similar, though less stringent, focus on the defendant's ability to behave "normally" *at the time of the crimes.*

Even at the first sentencing, Dr. Hoogerbeets' testimony had severe credibility problems. His insanity evaluation described Smith as having no mental disabilities. Yet a few months later, with no further evaluation, he testified that Smith was a borderline psychotic. Moreover, he only interviewed Smith for an hour. It is not surprising that the trial judge and the Arizona Supreme Court discounted his testimony.

Yet by the time of Smith's resentencing in 1979, his attorney had no qualms about resting on the testimony of these two experts, whose opinions the court previously rejected as not rising to the level of mitigation. Even the Arizona Supreme Court found the testimony of these experts to be "inexplicit and often equivocal." *State v. Smith,* 131 Ariz. 29, 638 P.2d 696, 701 (1981). As a result of the Arizona Supreme Court's remand for resentencing, Rempe now could present *any* evidence bearing on Smith's mental and emotional condition, as well as his background and character, that might avoid the penalty of death. Instead, he did nothing. He did not do any investigation. He did not even recall Dr. Hoogerbeets and Dr. Goldberg for additional testimony about Smith's mental condition irrespective of his "compulsive" tendencies at the time of the crimes. It is clear that there was other evidence counsel could have raised that would have strengthened the case for mitigation. The defense's own investigator witnessed evidence of multiple personalities. A friend of Smith's who was also a pastor believed that Smith possessed multiple personalities. An investigation into his family background would have revealed that Smith suffered from serious psychosexual problems stemming from developmental problems and conflicts with his par-

ents. His antisocial, egocentric, paranoid, manic and impulsive behaviors marked Smith with a sociopathic or psychopathic character disorder. Rempe also could have pointed to Smith's good relationship with his girlfriend. *See Smith v. Stewart,* 140 F.3d 1263, 1271 (9th Cir.1998) (noting that good family relationships are relevant mitigating evidence).

The failure to investigate Smith's background and mental illness was not a strategic decision. Rempe had never tried a death penalty case before. In an affidavit submitted to the court, Rempe admitted that he did not investigate Smith's case for mitigating evidence, even though he had more than four months to prepare for the resentencing. He did not understand what evidence constituted mitigating evidence. An exchange with the judge is illustrative of Rempe's complete failure to provide even a minimal defense to help spare Smith from death:

> REMPE: I only have really one area of mitigation that I was asking the Court to consider and that was under the old statute where the defendant knew right from wrong but yet it was still a McNaughton [sic] defense. I don't know how that reading, the new statute or reading *State v. Watson* stating that we can present any mitigating circumstances, I don't know what posture I would have to present that in other than to reurge the Court to consider ... the deposition of Dr. Hoogerbeets and the testimony of Dr. Goldberg, taking the standard that was enunciated in the code as to a possible mitigating factor, but I really show my ignorance-
>
> How would that work in *State v. Watson?* We are to consider all relevant mitigating factors. I don't know what the standard is now. Therefore, I am in essence asking the court what our stand would be.
>
> COURT: I would suggest that you present anything you, in your opinion or imagination, feel is a mitigating circumstance.
>
> REMPE: The only two things, as I had indicated, would be what the State said

they already read.... I would move both of those items [Hoogerbeets' and Goldberg's testimony] to be introduced in evidence and to be considered by the Court as mitigation and as to any argument, it will be rather brief and I would make it the day of sentencing.

At the sentencing hearing, the prosecution offered no additional evidence. Rempe briefly argued that the new death penalty statute still suffered from constitutional problems, even though two other courts had rejected that argument. He asked the sentencing judge to consider the recommendation of a probation officer in the supplemental presentence report to appoint another psychiatric expert, a request the court rejected based on what it perceived as a lack of supporting evidence from Hoogerbeets and Goldberg. Finally, Rempe reiterated the few sentences that he made at the first sentencing: "If we are looking to punish Mr. Smith, I can't think of a more heinous type of punishment than to lock someone up at the Arizona State Prison for the rest of his life."

Furthermore, Rempe even ignored the prosecutor's own doubts at Smith's guilty plea hearing as to Smith's lack of emotional stability. The prosecutor's comment should have set off fireworks for Rempe. He should have seized the opportunity to pursue any supporting evidence about Smith's background and mental condition, but he did not. In addition, for no apparent tactical reason, Rempe failed to attack the prosecutor's use of his prior rape convictions to aggravate his sentence. There was some evidence that the attorney representing him in his 1974 rape conviction labored under an actual conflict of interest. Moreover, a relevant argument existed that Smith's 1974 and 1976 rape convictions did not support one aggravating factor that the judge found: that they were prior felony convictions involving the use or threat of violence. At the time of the convictions, rape could be committed in Arizona without the use or threat of violence. *See* A.R.S. § 13-611. This argument was available to Rempe in 1979. In

all, there is no doubt that Rempe effectively presented no defense on Smith's behalf, amounting to abandonment of his client to the fate of death.

In similar circumstances, we previously have found deficient performance. In *Clabourne v. Lewis,* 64 F.3d 1373 (9th Cir.1995), defense counsel did not call any witnesses, introduce any evidence of the defendant's history of mental illness, or argue any other mitigation besides his mental condition at the penalty phase of a capital case. Like Rempe, Clabourne's attorney argued briefly that Arizona's death penalty statute was unconstitutional, and, as mitigating evidence, he only resubmitted evidence presented at trial to establish Clabourne's insanity.

As proof that Clabourne's attorney was deficient, we noted several problems that are replicated here. First, we said that the fact that the government rested on its evidence of mental illness at trial and made no further argument is proof that Clabourne's attorney failed to bring forth anything new at sentencing. Likewise, the government here rested on the evidence and argument presented at Smith's first sentencing. Next, we noted as deficient performance the failure of Clabourne's attorney to have his trial experts expound on the case for mitigation since the focus of these witnesses was on whether Clabourne met the test for legal insanity. In fact, defense counsel had argued before sentencing that one of those experts, Dr. Berlin, should have been provided the opportunity to supplement his testimony about Clabourne's mental state since his focus at trial was on showing Clabourne's psychosis and possible insanity. In light of this admission that the case for mitigation was incomplete, we said that the attorney's "failure to call Dr. Berlin, or to put on any additional evidence at the sentencing hearing is inexplicable." *Id.* at 1385 n. 19. We concluded that Clabourne's representation at sentencing amounted in every respect to no representation at all. *Id.* at 1387. Surely Smith's complete unawareness that he could recall Dr. Hoogerbeets and Dr. Goldberg for additional explanation is equally deficient without any supporting tactical reason.

Likewise, in *Hendricks v. Calderon,* 70 F.3d 1032, 1043 (9th Cir.1995), Hendrick's attorney failed to re-investigate his client's mental defenses in the sentencing phase of his capital case, even though he had presented evidence of mental impairment at the guilt phase. In that case, the defense had actually introduced a psychologist, Dr. Carson, to testify to Hendrick's past history of problems. We noted that lack of corroboration of Carson's testimony about his difficult childhood and mental problems, as well as the state's effective cross-examination, undermined the value of the testimony. *Id.* at 1044. We once again concluded the case "is more akin to those cases in which no mitigating evidence was put on." *Id.*

More recently, in *Bean v. Calderon,* 163 F.3d 1073, 1080 (9th Cir.1998), we reached the same conclusion after defense counsel failed to adequately prepare his penalty phase experts for their testimony and failed to conduct an adequate investigation. We found that the limited preparation and informational foundations for the mental health experts' conclusions severely undercut the effectiveness and persuasiveness of Bean's penalty phase defense. *Id.* at 1080–81. In *Wallace v. Stewart,* 184 F.3d 1112, 1118 (9th Cir.1999), we again recognized the duty of defense counsel "to seek out [evidence of the defendant's background] and bring it to the attention of the experts." The limited time Dr. Hoogerbeets and Dr. Goldberg spent with Smith and the narrow focus of their evaluation leads to the conclusion that they did little to aid Smith's fight for life, and any reasonably competent counsel at his resentencing would have at least recalled them or bolstered their testimony.

**B. Prejudice**

■ Because of Rempe's failure to provide competent representation, our confidence in the outcome of Smith' sentencing has been undermined. Arizona's death penalty statute mandates the death penalty if there is at least one aggravating

circumstance and "no mitigating circumstances sufficiently substantial to call for leniency." *See* A.R.S. § 13–703(E). For each of the Lee and Spencer killings, the presence of the other murder, Smith's prior rape convictions, and heinous nature of the crimes established aggravating circumstances. It was therefore "critical" under this scheme and in Smith's particular circumstances that counsel attempt to investigate and present the strongest possible case for mitigation. *See Smith,* 140 F.3d at 1270 (citing *Evans v. Lewis,* 855 F.2d 631, 637 (9th Cir.1988)).

█ Additional evidence of Smith's mental illness and background was readily available to Rempe which, cumulatively, might have had an effect on the sentencing judge. Richard Todd, a court-appointed investigator, witnessed Smith's "second personality" during their conversations. Smith had called himself John Jameson and talked as if he was Jameson on several occasions. His manner would change and he talked in the third person, at one time revealing the location of other murders. Todd told Rempe of these conversations. A friend of Smith's, Rev. Larry Maddox, also told the prosecutor during Smith's 1976 rape trial that Smith possessed multiple personalities. Rempe could have learned this information from Smith's previous attorney. Smith's former girlfriend, Debbie Lippiett, testified during the rape trial that Smith suffered from wide-ranging mood swings. At least, this information should have been furnished to Smith's psychiatric experts to strengthen their conclusions, making their testimony less "inexplicit and equivocal" to the judge. Without it, Smith's defense was undercut. *See Bean,* 163 F.3d at 1081. A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as "counsel" under the Sixth Amendment. *See Caro v. Calderon,* 165 F.3d 1223, 1228 (9th Cir.1999).

In addition, other experts were needed to corroborate Dr. Goldberg's testimony, by far the more thoroughly researched testimony of Smith's two experts. *See Hendricks,* 70 F.3d at 1044. For example, another psychologist, Dr. Donald Tatro, later interviewed Smith, administered tests and researched his family background. Like Dr. Goldberg, Dr. Tatro concluded that Smith had a "split personality," compartmentalizing himself into a "positive" and "negative" self. Smith normally kept these personalities separated, but when circumstances caused the two selves to overlap, the conflict became so unbearable that Smith would lose contact with reality, Dr. Tatro explained. This may be why Smith steadfastly maintained his innocence for the crimes, the doctor noted. Smith's reaction also corresponded to his well-documented mood swings from depression to paranoia. Smith even attempted suicide in prison.

█ Dr. Tatro showed how Smith's split personality arose from his disturbing family background. Raised in a deeply religious family, his father severely beat him whenever Smith defied him, and ignored him other times. His mother, on the other hand, was overly protective of Smith because of his asthmatic condition but abruptly distanced herself when Smith became a teenager. Smith developed two sides to his personality to keep his rage at bay. Dr. Goldberg apparently had interviewed Smith's family and friends about his background and character, but this information was given almost no attention in her testimony. In Arizona, character and personality disorders can be weighed as nonstatutory mitigating evidence. *See State v. Kayer,* 984 P.2d 31, 46–47 (Ariz. 1999). A difficult family background also may be mitigating if it significantly impacts the defendant's ability to control his actions. *See State v. Medina,* 193 Ariz. 504, 975 P.2d 94, 107 (1999).[3]

**3.** Despite the dissent's skepticism, it is clear that the failure to find further information about the defendant's psychiatric problems

When we consider the effect of the failure to present mitigating evidence in light of the aggravating circumstances present in this case, we must remember that

> [we] are not asked to imagine what the effect of certain testimony would have been upon us personally. We are asked to imagine what the effect might have been upon a sentencing judge. . . . Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer.

*Smith v. Stewart,* 140 F.3d 1263, 1270 (9th Cir.1998). The task described is not an easy one, and we must avoid any inclination to allow ourselves to be influenced by our own personal revulsion at the specifics of the crime. We are aided in that effort by our obligation under *Strickland* to reverse if our confidence in the sentence is undermined. We previously have found *Strickland*'s prejudice prong met where we concluded that defense counsel effectively presented no mitigating evidence at sentencing, despite the presence of aggravating factors. In *Hendricks,* 70 F.3d at 1045, for example, we stated that defense counsel's "failure to present the abundant and available background information . . . in any credible form fully satisfied the prejudice required under *Strickland.*" We have done the same with respect to failures of counsel in the sentencing phase of

a capital case in Arizona, because under Arizona's statute the judge must impose the death penalty in the absence of mitigating evidence. *See Correll v. Stewart,* 137 F.3d 1404, 1413 (9th Cir.1998) (finding prejudice established where Correll's attorney failed to present any evidence of mental illness sufficient to satisfy Arizona law). Here, Rempe's failure to do anything but offer evidence that the sentencing judge clearly rejected the first time around was a virtual admission his client should be put to death.

The horrific nature of the crimes involved here does not cause us to find an absence of prejudice. In *Hendricks,* we rejected the argument that heinous crimes make mitigating evidence irrelevant, noting that the factfinder in California has broad latitude to weigh the worth of the defendant's life. 70 F.3d at 1044. Moreover, despite the dissent's suggestion that a sufficiently brutal crime obviates the need for mitigating evidence, we have found prejudice where the presentation of mitigating evidence was wholly inadequate in cases involving crimes as horrific as those committed here. *See Wade v. Calderon,* 29 F.3d 1312, 1315, 1323–25 (9th Cir.1994).[4] Testimony by a doctor that Smith lost contact with reality during his violent outbursts, which were themselves a result of psychological tension built up be-

was due in large part to the fact that his lawyer had never tried a capital case, and did not understand the concept of mitigating evidence. Even the prosecutor, on the record, had doubts about Smith's mental state. Moreover, while the dissent describes the results of psychological evaluations to determine the defendant's competency to stand trial, ability to assist counsel, and mental capacity for purposes of the insanity defense, the dissent neglects to mention that a psychologist charged with the responsibility of determining whether or not Smith suffered mental problems for the purpose of determining if it was relevant mitigating evidence concluded that Smith did in fact have a split personality. Rather than presenting evidence that the same judge already had rejected, Smith's counsel should have presented new mitigating evidence that was available. His failure to do so constituted ineffective assistance.

4. The dissent cites *Gerlaugh v. Stewart,* 129 F.3d 1027, 1042 (9th Cir.1997), for the proposition that in some cases no mitigating evidence could prevent the death penalty. However, *Gerlaugh* stands only for the proposition that the absence of mitigating evidence may be irrelevant when no substantial mitigating evidence is available. The full context of the statement quoted is that *"[g]iven of all of this . . . no plea for mercy or leniency"* could have saved the petitioner. 129 F.3d at 1042 (emphasis added). The "this" includes the fact that, in the panel's judgment, "Gerlaugh could muster no substantial mitigating circumstances, and he has been unable to do so to this date notwithstanding the dogged efforts of his able attorneys." *Id. Gerlaugh* cannot be applied to a case where substantial mitigating evidence was available.

tween the two sides of his split personality, could have led a judge to feel that he was not deserving of the ultimate punishment. Thus, we cannot say with any confidence that information about the split nature of Smith's personality would not have led a sentencing judge to conclude that Smith was not deserving of the death penalty. Cf. *Evans v. Lewis*, 855 F.2d 631, 637–38 (9th Cir.1988) (finding prejudice and reversing Arizona sentence without analysis of nature of crime, where defense involved schizophrenia). Mindful of the fact that "the Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy," *Hendricks*, 70 F.3d at 1044 (quoting *Deutscher v. Whitley*, 884 F.2d 1152, 1161 (9th Cir.1989) (vacated on other grounds)), we remand for resentencing.

## IV. CONCLUSION

Smith was denied effective assistance of counsel at resentencing. We reverse the district court's denial of habeas corpus and remand with directions that it issue a writ releasing Smith from the sentence of death and directing that he be resentenced. We affirm the district court on the remainder of Smith's claims.

AFFIRMED in part, REVERSED and REMANDED in part.

FERNANDEZ, Circuit Judge concurring and dissenting:

I agree with the rejection of most of Smith's claims, but dissent from the grant of habeas corpus regarding his sentence.

Almost twenty-four years ago, Smith committed two crimes of unspeakable cruelty and brutality. I detail some of Smith's background and the facts of those crimes here because, though very briefly alluded to by the majority, a fuller description will reify the nightmare that counsel had to address when he was called upon to plead for Smith's life. We must understand that counsel was not faced with a mere legal abstraction. Neither were Smith's unfortunate victims.

By early 1975, Smith, who was then twenty-five years old, was already on probation for two first degree rapes. The leniency with which he had been treated for those 1973 convictions allowed him to continue to pursue his nefarious career. He began what would come to be a notorious series of desert rapes of female hitchhikers in the Phoenix area. In February 1975, Smith raped and sodomized a pregnant woman to whom he had offered a ride. See *State v. Smith*, 116 Ariz. 387, 389, 569 P.2d 817, 819 (1977). In July, Smith and a companion kidnapped, raped and viciously stabbed a fifteen-year-old girl, who was hitchhiking. See *State v. Smith*, 123 Ariz. 243, 246, 599 P.2d 199, 202 (1979). Those two incidents prefaced the subsequent murderous attacks which are the subject of this case.

In December of 1975, Smith took eighteen-year-old Sandy Spencer into the desert. There he stripped her and killed her by forcing dirt into her mouth and nose, which resulted in her death by asphyxiation due to the obstruction of her breathing passages. Not being satisfied with that cruelty, he also stabbed her 19 to 20 times in the groin and pelvic area, including inside her vagina. In addition, he stabbed her in both breasts and left a two and half inch sewing needle imbedded in her left breast and chest wall. All of these wounds were inflicted while she was still alive. Sadly enough, that did not satiate his appetites.

A month or less later, Smith picked up fourteen-year-old Neva Lee. She, too, was carried off to the desert, where Smith raped her and then murdered her by the same methods he had used on Sandy Spencer. He forced dirt into her mouth, larynx and trachea, down into her windpipe and both lungs. He also taped her mouth shut. She, too, died of asphyxiation. Again, Smith saw fit to inflict still further suffering upon her. She was stabbed at the left side of her vulva, and sustained tears in her vulva and vagina, all prior to her death. She had been bound

hand and foot and had been stabbed in the breasts with something like a sewing needle. She also had numerous other bruises and wounds on her body, some inflicted before she died, and some at about the time she died or thereafter.

Those were the facts about Smith's actions that counsel had to grapple with. After Smith had been convicted of Neva Lee's murder, he pled guilty to Sandy Spencer's murder in the midst of his trial for that crime. He was then sentenced to death for those murders, but counsel obtained a new sentencing hearing for him at which counsel was told that he could place "any mitigating circumstance" before the sentencing court. *See State v. Smith*, 123 Ariz. 231, 243, 599 P.2d 187, 199 (1979). Counsel was not sure just what evidence could be considered mitigating. Given the constellation of facts with which he was faced, that is understandable.[1]

What his client had done was surely egregious. But what of Smith's background? Well, Smith insisted that his childhood (always a favorite source of mitigating evidence) had been normal. He had been raised by his natural parents, had no real conflicts with them, and grew up with them and his sister. Indeed, he was close to his mother and father and could not recall any significant difficulties or any particularly traumatic event. There was no history of psychiatric problems or drug or alcohol abuse in his family. Smith was popular in school, and graduated from high school, after which he attended college. His father was a machinist, and Smith worked at his father's shop during the relevant time. (It was there, by the way, that he tried to put upon a female undercover police officer, which ultimately brought his murderous career to an end.) There was not much mitigation there one would think. What to do?

Largely at counsel's request, Smith had been examined by no less than six mental health professionals, psychiatrists all. None of them found any mental impairment severe enough to have affected Smith's ability to participate in court proceedings, and to assist counsel. More than that, none thought that Smith was incapable of appreciating the nature and quality of the offenses when he committed them, and one psychiatrist opined that Smith was not suffering from any mental illness or defect at the time. Be that as it may, counsel made the sentencing judge aware of Dr. Hoogerbeets' opinion that Smith was mentally disturbed, " 'a border-type psychotic person, with an abnormal psycho-sexual development, very strong neurotic traits, which drives him to compulsory aberrant actions. Unfortunately, often highly deviant and violent in nature.' " *State v. Smith*, 131 Ariz. 29, 32, 638 P.2d 696, 699 (1981). Another psychiatrist, Dr. Goldberg, opined that Smith was a sadistic sexual slayer who is possibly psychotic and who had poor ego control along with, perhaps, compulsive behavior "over which [he had] little control." *Id.* at 32–33, 638 P.2d at 699–700. If a judge were inclined to find mitigating circumstances, that testimony, if believed, would surely have led to a conclusion that there was some mitigation. *See id.*; *see also, id.* at 35, 638 P.2d at 702. There was psychiatric evidence on the other side which the Arizona Supreme Court ultimately accepted, but that is not the point of this discussion. The point is that the possibly mitigating psychiatric evidence was known to counsel, and was placed before the Arizona courts by him. Not satisfied with that, counsel asked for still another psychiatric expert; that was denied.

What else might there be? There was his behavior in jail and in prison. That

---

1. Counsel asked the learned trial judge for guidance. Perhaps the judge was just as puzzled, or perhaps he had the wisdom not to say anything that might limit the possibilities. At any rate, he said "I would suggest that you present anything you, in your opinion or imagination, feel is mitigating circumstance."

Had the judge been much more specific or detailed, he might have been accused later of having inhibited or misled the defense. *See, e.g., Wilson v. United States District Court (Siripongs)*, 161 F.3d 1185, 1186–87 (9th Cir. 1998).

can be a factor, but the information was before the sentencing court, as counsel and the court knew.

In the face of all of that, counsel did still argue for his client's life and did attack the Arizona death penalty statute itself. Moreover, he appealed when he lost, and he argued for his client's life in the Arizona Supreme Court. But counsel did not do further investigation. That was because he had a failure of imagination, or of legal acumen, or both. Had he investigated, what, after all of these years, has been discovered that would mitigate the powerful aggravating circumstances arrayed against Smith? The district court was told that two lay witnesses would have indicated that Smith seemed to have multiple personalities,[2] and one lay witness would say that Smith had wide mood swings. Of course, none of the mental health professionals had detected multiple personalities. I am highly dubious about dubbing the failure to discover this asthenic mitigating evidence as being so far outside the range of the competence we expect from attorneys that counsel "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

But let us take counsel at his word. Let us agree with him that his confusion, lack of acumen, lack of imagination, even ennui in this death penalty case was outside the range of tolerable attorney behavior. Let us say, in other words, that because it was not simply tactics that kept him from presenting the additional information, his behavior was not reasonable. *Cf. Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir.1995). Smith must still show that he was prejudiced. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. That is, he must show that the result of his sentencing is not reliable. *Id.* He must demonstrate "that there is a reasonable probability that, but for coun-

sel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. He must show that, ultimately, there was a reasonable probability that the Arizona Supreme Court "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069.

Can Smith meet the *Strickland* prejudice standard? I think not. I am, of course, cognizant of the difficulties presented by prejudice assessment in a case where we must ask ourselves what effect further evidence would have had on the sentencing judges. *See Smith v. Stewart*, 140 F.3d 1263, 1270–71 (9th Cir.1998) (*Bernard Smith*). But Smith was no mine-run killer. We cannot say, as we have said before, that "while the facts of this case are bad enough to disturb even a jaded observer, they do not reach the level of those in cases where the aggravating facts were so overwhelmingly horrifying that it was highly improbable that mitigating factors of any ordinary stripe would help." *Bernard Smith*, 140 F.3d at 1271. This *was* the kind of case that cried out for powerful mitigation, if Smith's life was to be saved. This is the kind of case about which we have said that the defendant "sentenced himself to death," and that "no plea for mercy or leniency on [his] behalf, indeed no oral argument on his behalf, could have altered what [he] himself set in motion." *Gerlaugh v. Stewart*, 129 F.3d 1027, 1042 (9th Cir.1997). Counsel's sentencing failures did not prejudice Smith.

If we take off our legal lenses for a moment and step back to look at this record and at what Smith did to his unfortunate victims, the decision to return this case for resentencing almost takes one's breath away, if, indeed, it is not too incongruous to say that anything touching a process as slow as that which exists in this country[3] can ever be called breathtaking.

---

**2.** Interestingly enough, one of those supposed "personalities" was named John Jameson, which just happened to be the name of the prosecution's witness who Smith said committed the Lee murder. Smith had been dating Jameson's estranged wife.

**3.** Twenty-three years and counting in this case.

And even with our glasses back in place, the thought that some lay opinion about a split personality would have caused the trial court to flinch from awarding Smith the death penalty does startle one. With all due respect, legal lenses should not be blinders.

Therefore, I respectfully dissent from the grant of habeas corpus on the sentencing claim, although I concur in the rejection of the other claims.